Adams *v.* Smith.

---

## ADAMS *v.* SMITH.

*N. Y. Supreme Court, First District,* Before FRANCIS LYNDE STETSON, *Referee; December,* 1887.

1. *Statute of descents ; relatives of half-blood.*] Although the undivided interest of an heir in the real estate of a deceased ancestor is not separately ascertained in particular parcels thereof until a final decree in partition, setting them off to him, yet his estate in such parcels is derived, not from the decree but by descent, within the statute (1 R. S. 753, § 15), providing that descendants of relatives of the half-blood shall inherit in the same manner as the descendants of the whole

blood "unless the inheritance came to the intestate by descent, devise or gift of some one of his ancestors." *

2. *The same ; division upon basis of representation.*] Under the statute of descents, not only do the class of nearest relatives of the decedent take equally where they are his only heirs at law, but all the original members of that class take equally by themselves or by their representatives where some of them have died leaving issue, in the same manner as if they had survived the person last seized, and had then died intestate. And if all the original class of those who would have been his heirs, die before the testator, there is no representation of any in that class, but the next class become his heirs and take, with the representatives of any deceased in that next class.†

3. *The same; rule applied.*] Hence, where the only heirs are the plaintiff, a son of a deceased sister of the intestate, and the defendants, four sons and a granddaughter of a deceased brother of the intestate, the plaintiff is not entitled to one-half the lands of the intestate, as the representative of the deceased sister of the intestate, and the defendants to the other one-half, as the representatives of the deceased brother of the intestate, but all are entitled to an equal share, that is, one-sixth of the inheritance.

4. *The same; who is an ancestor.*] The term "ancestors" in this statute includes collaterals ; and a half-brother of the deceased, whose estate he inherits, is deemed to derive the inheritance from an ancestor, as the term refers to ante-cessors in estate, and not necessarily to ante-cessors in pedigree.

---

* The statute (1 R. S. 753, § 15; same stat. 3 R. S. 7 ed. 2212) is as follows: "Relatives of the half blood shall inherit equally with those of the whole blood in the same degree ; and the descendants of such relatives shall inherit in the same manner as the descendants of the whole blood, *unless the inheritance came to the intestate by descent, devise or gift of some one of his ancestors,* in which case all those who are not of the blood of such testator shall be excluded from such inheritance."

In deciding this point, the referee followed Conkling v. Brown, 8 *Abb. Pr. N. S.* 345 ; S. C., 57 *Barb,* 265; citing also McCarty v. Marsh, 5 *N. Y.* 263; Wheeler v. Clutterbuck, 52 *N. Y.* 67; Valentine v. Wetherill, 31 *Barb.* 655; Beebe v. Griffing, 14 *N. Y.* 235; Gardner v. Collins, 2 *Peters* ( *U. S.*) 58.

† In other words, representation in the case of real property only comes in to take the place of deceased members of a class of equal degree, when one or more members of that class are living and entitled to take. If all of a class who would have taken by themselves or representatives, had any of the class survived, are deceased, the law looks to the next degree, not for representatives of the first mentioned

5. *Lunatic ; use of personalty to pay liens on realty ; respective rights of heirs and next of kin.*]   Where the committee of a lunatic in good

class, but for another class, and these all take equally by themselves, or, if some are deceased, by the representatives of such.   1 R. S. 752; 3 R. S. 7 ed. 2211, §§ 8, 9, 10.

The distinction between cases in which title passes by descent and by representation, respectively, may appear clearer from the following diagram, applying the facts of this case.

| Jonathan (brother) | Charlotte (sister) | | Sidney (intestate) | | Adon (brother) | |
|---|---|---|---|---|---|---|
| No issue | | | No issue | | | |
| | | Delia (deceased) | Deft. J. Hunt. | Deft. Harlan. | Deft. Adon. | Deft. Jonah. |
| Plf. Adams | | | | | | |

Deft. Louise.

All the intestate's brothers and sisters being deceased, none are allowed to be represented.

In the next class, all are therefore entitled to share equally, the nephews all surviving, each taking one-sixth, and the daughter of a deceased niece, taking one-sixth as representative of that niece, her mother.

The referee on this point deferred to the authority of Pond *v.* Bergh, 10 *Paige*, 148; citing also Kelly *v.* Kelly, 5 *Lans.* 443 ; Hyatt *v.* Pugsley, 23 *Barb.* 285 ; 33 *Barb.* 373.

This question was very closely contested, and decided the same way under the Virginia statute of descents, in Davis *v.* Rowe, 6 *Rand.* 355; that statute making no express provision on the point.

The facts and the decision are tersely stated in an article on Thomas Jefferson as a Legislator, 11 *Virginia Law J.* p. 721, as follows:

"Anthony Gardner, a wealthy bachelor, died. He had had one brother and one sister, both of whom had died before him, leaving issue who survived Mr. Gardner. The brother left *one* child, Mrs. Davis. The sister left two sons, who were living at A. G's death, and two families of grandchildren, the issue of two daughters who had died before Anthony Gardner. Was Mrs. Davis to stand in the place of her father, and take one-half of her uncle's estate, the other half being divided among her cousins, one-eighth to each ; or, as she and her cousins were all alike the nephews and neices of their uncle, was the estate to be divided into five equal parts, one of which should go to Mrs. Davis, one

Adams v. Smith.

faith applies his personal estate to the discharge of mortgages upon his real estate, and the question whether such payment shall enure to the benefit of the real estate, or the land be charged with an equity in favor of the next of kin, is neither decided by declaration of a charge nor expressly reserved, the heirs of the lunatic take the real estate as they find it, discharged of the incumbrances.

The cases as to infants, distinguished.

6. *The same ; statutes.*] There is no statute of this State in any way limiting the power of the court over the conversion of a lunatic's personalty into realty by the payment of liens thereon ; the provisions as to sale of a lunatic's realty (2 *R. S.* 53 ; *Code Civ. Pro.* § 2359) binds only a committee and not the court.

7. *The same ; assignment of mortgages to committee.*] It is not the duty of a committee, upon payment of mortgages upon the lunatic's real estate, to take an assignment thereof in the interest of his next of kin; especially where the decree in partition assigning the lands to the lunatic subject to the mortgages given thereon by the person from whom the lunatic inherited them, expressly provides that the incumbrances upon the lands partitioned should be paid by the respective recipients thereof.*

---

to each of the Rowes, her living cousins, and one pass to each family of the dead cousins ?  The difference to Mrs. Davis was between *one-half* and *one-fifth,* and was worth a struggle.  A powerful effort was made by very able counsel to maintain her claim to one-half the property by the application of the English canon of the *jus representationis.*   The decision was against her.   The court, in a discussion spoken of by Chan. Kent as ' marked by great industry and legal erudition,' [4 *Kent. Com.* 402 *N. Y.*] held that the statute of descents was a total destruction of each and all of the rules of the common law of descents, including the *jus representationis ;* and that it furnished a complete rule in itself ; that while the case before the court was not expressly provided for, the act contained the principle which governed it,—namely, that it follows the natural course of the affections of the heart, preferring as heirs the *classes* nearest in blood, and in the same class giving the individuals nearest the intestate larger portions, and allowing those more remote to take *per stirpes.*   After this decision, the ruling of the court was incorporated into the act by an amendment."

For the rule in New York, as to personalty, see 2 R. S. 97; same stat. 3 *Id.* 7 ed. 2304.

* See Note on Special Clauses in Judgments of Partition, at the end of this case.

8. *The same; resort to realty to pay debts.*] It is proper for the committee of a lunatic to use and to continue to use the personalty until exhausted in payment of the lunatic's debts, before resorting to the realty.

9. *The same; approval of committee's accounts; effect.*] The court's approval and allowance of the accounts of the committee of the lunatic showing his use of the personal estate in payment of incumbrances upon the real estate, is equivalent to a prior order directing such payment, and its propriety cannot be questioned by the lunatic's next of kin after a considerable lapse of time.

10. *The same; payment from personalty for repairs on realty.*] The next of kin of a deceased lunatic have no equitable claim as against the heirs to an allowance for moneys expended by the committee merely to keep the lunatic's real property in tenantable condition, and not for the permanent improvement thereof.

Trial before referee.

This action was brought by John Hunt Adams against Harlan P. Smith and others to partition the real estate of which Sidney Smith, a lunatic, died seized.

Jonathan Hunt died in 1847, leaving a large amount of real estate situated in the city of New York, subject to mortgages. By a decree in a partition suit between his heirs, entered in October, 1849, nine of the thirty-four parcels constituting his real estate were set off to Sidney Smith, who was then a lunatic, and who remained so without a single lucid interval until his death in 1886.

At the time of the lunatic's death he was seized and possessed of five out of the nine parcels allotted to him under the partition decree. Prior to April 1, 1863, the mortgage incumbrances upon these five parcels of real property, amounting in the aggregate to about $59,000, had peen paid and discharged by the committee of the lunatic, and the other four parcels allotted to him had been sold by the committee. The sale of these four parcels was made in 1850 under an order of the supreme court, which directed the proceeds of such sale, amounting to about $8,000, to be applied in satisfaction to that extent of the mortgage incumbrances upon the unsold parcels. The

remainder of the mortgage debt, about $51,000, seems to have been paid by the committee out of the personalty of the lunatic.

The present action to effect partition of the five parcels allotted to the lunatic under the partition decree is brought by John Hunt Adams, one of the defendants in that partition suit, against all of the heirs and next of kin of the deceased lunatic.

The plaintiff's mother, who died in 1842, was sister of the lunatic Sidney Smith, and was uterine half-sister of Jonathan Hunt, from whom all the property in this suit is derived.

The only other parties who are of the blood, both of the lunatic Sidney Smith and of Jonathan Hunt, are the defendants J. Hunt Smith, Adon Smith, Harlan P. Smith and Jonah D. F. Smith (sons of Adon Smith, deceased, a full brother of the lunatic and a uterine half-brother of Jonathan Hunt), and the defendant, Louise F. Johnson Wheeler, a daughter of Delia Smith Johnson, a deceased sister of the last four defendants.

In other words, Jonathan Hunt left him surviving no wife, father or mother, nor any relative of the whole blood. He did, however, leave two brothers of the half blood,—Adon Smith and Sidney Smith, the lunatic,—and one nephew, J. Hunt Adams, the plaintiff, who was the son of Hunt's deceased half-sister, Charlotte Smith Adams.

Sidney Smith having died unmarried and without issue, his four nephews, the defendants, J. Hunt Smith, Adon Smith, Harlan P. Smith and Jonah D. F. Smith (sons of his deceased brother Adon Smith), one great-niece, Louise F. Johnson Wheeler (daughter of Delia Smith Johnson, a deceased daughter of his brother Adon Smith), and one nephew, the plaintiff (son of his deceased sister, Charlotte Smith Adams) are heirs at law.

The controversy in this case involves three principal questions: the first, concerning the descent of real prop-

erty from an intestate to his collateral relatives of the
half-blood; the second, as to the extent to which division,
upon the basis of representation, should be carried among
descendants, in unequal degree, of the deceased collateral
relatives of an intestate; and the third, as to the possible
effect of a change, by the committee of a lunatic, in the
character of his estate, upon the respective rights of his
collateral heirs at law, and next of kin, upon his decease,
intestate, without parents or issue.

*Horace Russell* and *George M. Wright*, for the plaintiff.

*William Man,* for Adon Smith and another.

*John E. Parsons,* for H. P. Smith and another.

*George Hoadley* and *F. R. Minrath*, for Sidney J.
Smith.

*Wm. Bruorton,* for Louise F. Wheeler.

*C. W. Underhill,* for J. D. F. Smith.

*George A. Haven,* for Samuel R. Smith.

*Cary & Rumsey* and *F. D. Dowley,* for the infant de-
fendants.

FRANCIS LYNDE STETSON, Referee.—[After deciding the
first two principal questions, as stated in the head-notes.]—
The *third* principal question is that as to which the con-
test before me has been most strenuous, and my decision
may be most open to question in view of the divergence
of authority in the ninety cases cited before me on the
proposition that, in some way, or upon some principle, the
lunatic's next of kin are equitably entitled to an allowance
or recovery of about $51,000, expended by the committee
between 1850 and 1863, and probably drawn from the
personal estate for the discharge of mortgage incum-
brances on the real estate of the lunatic.

There being no conflict as to the facts upon which the

next of kin (other than those who are heirs at law), base their claim of special equity, it will, I think, be found satisfactory to proceed at once to an examination of the reported decisions concerning the vexed question of the respective rights of an intestate lunatic's next of kin and heirs at law.

This question, for more than two centuries, has been the subject of contest in the courts of England, Ireland or America, but as yet, in the State of New York, no direct decision has been rendered, though I consider the principle to have been settled. I should fail to do justice to the exhaustive arguments of the counsel for the plaintiff and for the defendants, Jonah D. F. Smith, Louise F. Wheeler and Sidney J. Smith, or to the difficulty and importance of a still open question not yet directly decided in our State, were I to fail to consider and discuss the more important cases cited before me.

At the outset, it may be well to observe four distinctions, in disregard of which some decisions have been so misapprehended as to lead to an unfortunate confusion in the law.

The first and most important distinction is that maintained between the estates of infants and those of lunatics. These two classes of incompetents do not, in legal contemplation, stand upon the same ground; but somewhat general *dicta*, introduced and employed originally in causes solely concerning infants' estates, have unfortunately and improperly been accepted and treated as equally applicable in some cases in lunacy. For this reason it is necessary to refer to some of these infant cases, not as precedents, but to exhibit the sources of confusion.

A second distinction to be regarded is that between a change of realty into personalty, and the contrary change of personalty into realty. It is a noticeable fact that, with an apparent disposition to protect landed estates,

courts and legislatures alike have uniformly restricted the conversion of realty, but not always that of personalty.

A third and vital distinction obtains between a change of personalty into realty, made wantonly, or without regard to the interests of the lunatic, and one made solely for his benefit.

And finally, a fourth and important distinction exists between a conversion of personalty through the purchase or "betterment" of real property, and its use in payment of debts that are charged on the lunatic's land.

Keeping these distinctions in mind, we may proceed to examine the cases.

In the case of Dennis v. Badd (1 *Ch. Ca.* 156; *Eq. Ca. Ab.* 261, pl. 1), January 31, 1671, Sir HARBOTTLE GRIM-STON, M. R., decided that an *infant's* estate, in his guardian's hands, ought to be employed to pay his debts.

But, in two later cases (hereafter examined), this is referred to as a case, not merely of an *infant*, but of an *idiot* as well. Thus it is said (Earl of Winchelsea v. Norcliffe, 1 *Vernon*, 434; *Ex parte* Bromfield, 1 *Ves. Jr.* 453), that Dennis v. Badd was a case where the committee of an *idiot* had bought in a mortgage that was upon the *idiot's* estate, and the estate descended to another *idiot;* and, though the mortgage was kept on foot by an assignment in trust, yet, on a bill brought by the committee, it was decided that the lands should go to the heir, and that the mortgage should not be taken as personal estate; and an heir shall, by the course and justice of this court, have the personal estate applied in ease of the real, and to discharge mortgages, though there be no covenant for payment of the mortgage money.

Lord Ch. JEFFERYS further observed (1 *Vern.* 436) that, in Dennis v. Badd, had the money come to the hands of the executor, yet in his hands it would have been liable in equity to the debt due by mortgage; and the heirs should have been compelled so to apply the same; so that there the trustees did no wrong or prejudice to the executor,

nor more than what the executor himself might have been compelled to have done.

Thus understood, Dennis *v.* Badd, the oldest reported authority that has come to my attention, is directly in favor of the contention of the heirs at law in the case before me.

In the Earl of Winchelsea *v.* Norcliffe (1 *Vern.* 434), February 19, 1686 (an infant's case), it was held by JEF-FREYS, Lord Chancellor, that £3,000, saved by an infant's trustees out of profits of realty, and *invested in land,* remained personalty, and passed to next of kin, *but without interest, against which was set off the profit of the purchased land.* (In one aspect this last limitation is important.)

The counsel cited and the court considered, Dennis *v.* Badd, as last before noted, and the chancellor was much impressed with the point, *for the first time* raised in this case by Mr. Sergeant RAWLINSON, viz., that an infant's power of testamentary disposition differed as to realty and personalty (see, also, 3 *Peere Williams,* 101 D., 6th ed.). This is the first distinction observed above.

In Awdley *v.* Awdley (2 *Vern.* 192), November 19, 1690 (a lunatic's case), the lords commissioners held that a lunatic's money, used by his committee in the purchase of lands in fee, should nevertheless be considered personalty, and go to the next of kin.

The decree in this suit first propounded the now famous doctrine that " it *was not in the power of committee to alter the nature of a lunatic's estate.*"

This ancient learning reappeared in 1730 (3 *Peere Williams,* 100) and long afterwards affected several decisions, notably that of Chancellor HART in Weld *v.* Tew, which gave no consideration to two important features of this case : *first,* that it related not to the payment of a lunatic's debts, but only to the conversion of his personalty into realty by way of investment ; and, *secondly,* that upon the argument the counsel for the next of kin spec-

·ially recognized this characteristic feature by distinguishing the (otherwise unreported) case of Zoach *v.* Lloyd, where a mother, as guardian to her infant son, had, out of his personal estate, paid off a mortgage, and upon his death was not allowed to recover back the money. The distinction drawn was that "the guardian had done no more than what, by the justice of this court, she might have been enforced to do, viz., to apply the personal estate in ease of the real by taking off the incumbrances that lay upon it."

· Dennis *v.* Badd was also cited, but was not overruled ; the silence of the court concerning such a precedent indicating that the noted contrary phrase of the decree could hardly have been intended to operate as comprehensively as some later judges have supposed.

Sir ANTHONY HART, considering Awdley *v.* Awdley, the earliest case (see *Beatty,* 269), singularly enough, gives no consideration to these two precedents therein cited.

In a recent American case (Paul *v.* York, 1 *Tenn. Ch.* 547) it is correctly observed that, so far as concerns lunatics' estates, this decree in Awdley *v.* Awdley is exceptional and out of the general current.

In Palmes *v.* Danby (*Precedents in Ch.* 137), Hilary, 1700 (an infant's case), the question was whether, where an estate descends to an infant, subject to incumbrances, the guardian must or may (without the direction of a court of equity) apply the profits to discharge the incumbrances or the interest of them, or whether they should not be accounted personal estate, and so the administrator of the infant is entitled to them if the infant die during his minority. The court (Sir NATHAN WRIGHT, Lord Keeper) held, that a "guardian without direction may pay the interest of any real incumbrance and the principal of a mortgage, because that is a direct and immediate charge on the land." This is the rule in respect of infants now observed by our courts (see Banks *v.* Taylor, 10 *Abb. Pr.*

199, 202), and *a fortiori* should be the rule in respect of lunatics, as I consider it is.

In Dormer's Case (2 *Peere Williams*, 263), 1724 (a lunatic's case, involving the precise point), Lord Chancellor MACCLESFIELD authorized the payment of mortgages from personalty, notwithstanding the objections of the next of kin, who, it is to be observed, were accorded a hearing by the chancellor. Here first found expression the consideration, since embodied in many decisions, that a lunatic is never to be looked upon as irrecoverable, and, therefore, said the chancellor: "It is his benefit and comfort that I am to take care of when no creditor complains, and not to heap up wealth for the benefit of his administrators or next of kin." This decision and its principle alike are directly in favor of the heirs at law in this suit.

In Witter *v.* Witter (3 *Peere Williams*, 101), 1730, before Lord Chancellor KING, it was insisted that, in case of an infant, a trustee cannot change the nature of the estate by turning money into land, or a lease for five years into freehold, and attention was called to the varying testamentary powers of an infant concerning realty and personalty (already noted: 1 *Vernon*, 435). The chancellor, therefore, held that a lease renewed for lives (and consequently realty), by a guardian for an infant's benefit, should follow the nature of the original lease, which was for years, and therefore personalty. As an infant's case, involving a question of investment, this determined nothing as to the payment of a lunatic's debts.

In Pierson *v.* Shore (1 *Atkyns*, 480), July 28, 1739, which was an infant's case, Lord HARDWICKE laid down two distinguishing principles already noted: (1.) That an *infant's* personal estate turned into real is still considered as personal, because of the different ages at which the infant may dispose of his personal and his real; and not with any purpose of favoring one representative more than another. (2.) That the act of a guardian, when reasonable, will have the same

consequence as if done by the infant; otherwise if wantonly done by the guardian without any real benefit to the infant. (This proposition was emphasized in the next succeeding case.) Otherwise this decision does not concern lunatics.

In *Ex parte* Ludlow (2 *Atkyns*, 407), August 13, 1742, Lord HARDWICKE compelled a lunatic's committee having a prospective interest in his realty, to make good to personal estate £25 which they had drawn therefrom for repairs instead of cutting timber. This was to punish an interested committee for a wanton act in administration, not in payment of debts.

In Sergerson *v.* Sealey (2 *Atkyns*, 412), October 25, 1742 (in which a lunatic's land was protected from conversion), Lord HARDWICKE decided to sustain a purchase of land by the lunatic made before proceedings against him, but within the period of his insanity as fixed by the subsequent inquisition. Lord HARDWICKE observed that "the court ought especially to give the turn of the scale in favor of an heir," and he further said that: "Though it is very true, the court will not order the personal estate of a lunatic to be turned into real estate, yet there have been applications to this court to lay out part of his personal estate in repairs or even upon improvements of his real estate, and the court have allowed it, if the next of kin at that time, who if he was dead would be entitled to his personal estate, do not show any reason against it, and such an order of the court has been even binding upon other persons who were not consenting to the order at the time it was made but happened to be the next of kin at the lunatic's death."

This case is important as again showing (1) that a lunatic's estate is not governed by the same rule as an infant's; (2) that even "betterments" to the real estate had been allowed out of the personalty ; and (3) that those having a prospective interest were heard by the court, and if not heard were bound by its order.

In Matter of Degge, a lunatic (see *Beatty*, 270), March-May, 1743, Lord HARDWICKE ordered a lunatic's committee to pay off a mortgage out of the estate of the lunatic and that the mortgagee should assign over the mortgage in trust for the lunatic, his executors, administrators and assigns, and that such trustee should declare the trust accordingly. This order was subsequently considered by Sir ANTHONY HART (*Beatty*, 271), as a deliberate judgment of Lord HARDWICKE that the court would not alter the succession, although it was for the benefit of the lunatic that the mortgage should be paid off. But Sir EDWARD SUGDEN, afterward differing (see 6 *Irish Eq.* 363) from his predecessor, discussed at great length this decision of Lord HARDWICKE, which he thought established no general rule in view of the peculiar circumstances of the case, especially as no opinion was delivered, nor any decree known until discovered after a century by Sir ANTHONY HART.

This Matter of Degge again came up in 1764 before LORD NORTHINGTON (4 *Brown Ch. C.* 235 ; also, *Beatty*, 270), and a decision rendered which, as afterwards observed by Sir EDWARD SUGDEN (see 6 *Irish Eq.* 363), proceeded only upon the principle that the personal estate of a lunatic should not be laid out in the purchase of real estate. Lord NORTHINGTON, eight years later, in Grimstone's case, held for the heir at law.

So far as Degge's case involves the question of leases for lives, it presents a special distinction subsequently considered by Lord PLUNKETT (3 *Irish Eq.*, 414) and observed in *In Re* Gist (5 *Ch. Div.* 881 ; S. C., 22 *Moak's Eng.* 534), because a life tenant can have little or no benefit from discharging an incumbrance on a fee.

In *Ex parte* Annandale (*Ambler*, 80), Dec. 19, 1749, a case involving a question of investment only, Lord HARDWICKE made use of a general phrase next to that in Awdley *v.* Awdley (2 *Vern.* 192), most favored by those asserting inconvertibility of a lunatic's estate. He said

that: "The first care of the court is the maintenance of the lunatic; and after that it is a rule never departed from not to vary or change the property of a lunatic so as to effect any alteration as to the succession to it."

This phrase has been so frequently and closely considered that for present purposes it is sufficient to observe (1) that in terms it was to apply only after maintenance of the lunatic, in which naturally would be included the payment of debts which might imperil or embarrass his maintenance, depending perhaps upon income drawn from property incumbered to less than its value; and (2) that, as observed by Lord LOUGHBOROUGH in Oxenden v. Lord Compton (2 *Vesey, Jr.* 69–76) : "There was nothing calling for that decision; and in what Lord HARDWICKE decided he materially varied the succession."

In Inwood v. Twyne (*Ambler*, 417; 2 *Eden*, 148), June 23, 1762, being an infant's case, Lord NORTHINGTON held that: "Guardians and trustees may change the nature of infants' estates under particular circumstances; and the court would support their conduct if the court would do it under the same circumstances. They cannot do it wantonly, but where it is manifestly for the convenience of the infant." Blunt's 2d edition of Ambler adds this: "In general, a trustee or guardian shall not change the nature of an infant's property; but it is established that where a person is acting *bona fide* for an infant without any intention to prefer either representative, *there is no equity between them, but the thing must stand as it is, and they must take the property as they find it.*" (See also note, 2 *Eden*, 155.)

Lord THURLOW considered this precedent applicable to a lunatic's estate, as to which he said (1 *Vesey*, 461 ): "If I am at liberty to follow the principles and reasons of natural justice, they are very strongly expressed by Lord NORTHINGTON in that case in Ambler."

Flanagan v. Flanagan (see 1 *Brown Ch. C.* 500, 514; 2 *Vesey Jr.* 77, 75, 176), was an infant's case, decided June

8, 1768, by Lord CAMDEN. It is not separately reported, but its purport was given by Lord LOUGHBOROUGH upon the hearing of a later case (Walker *v.* Denne, 2 *Vesey*, 170), as follows: " I was always much struck with Lord CAMDEN's opinion in Flanagan *v.* Flanagan. By a mistake of this court land was converted into money. More was sold than ought to have been sold; and it was contended the court would rectify it; and that the excess should be considered as land; but Lord CAMDEN went upon the ground that between real and personal representatives there is no possible equity; but they must take their rights as they find them."

This case, though at variance with some later decisions (see Sweezy *v.* Thayer, 1 *Duer*, 286), is of importance in our discussion as showing that here, as in at least four earlier cases, the propriety of converting the estate of an infant or lunatic was recognized (contrary to the assumption of the learned counsel for Sidney J. Smith) prior to the celebrated decision in Grimstone's Case.

In Matter of Hogan, a lunatic (see *Beatty*, 271), in 1771, Lord Chancellor APSLEY held that for moneys spent in discharging a mortgage upon a lunatic's estate, which had descended incumbered by the lunatic's father, a lien should be declared in favor of the next of kin. But as observed by another, this case is of little value as a precedent in view of Lord Chancellor APSLEY's decision to the contrary the next year in Grimstone's Case.

*Ex parte* Grimstone (*Ambler*, 706; 4 *Brown Ch. C.* 234; 2 *Vesey*, 76, note), a lunatic's case exactly in point, was decided May 5, 1772. Certain mortgages paid off in the lifetime of a lunatic out of the savings of the estate were by order of Lord NORTHINGTON, Chancellor, assigned to attend the *inheritance.* Upon the death of the lunatic, the matter coming up on petition of the next of kin, Lord Chancellor APSLEY (or BATHURST), first held for the next of kin; then, in view of the previous decision of Lord NORTHINGTON, he reconsidered; and, upon consultation with Chief Justice

De Grey (Baron Smythe dissenting), he reversed himself and held for the heir at law, saying: "In the management of the lunatic's estate the ruling principle is to do what is for the benefit of the lunatic. To lay it down as a rule that all the savings out of the real estate shall in all cases go to the next of kin is inverting the principle. The court every day orders the savings to be laid out in repairs and to discharge incumbrances on the real estate. *The case of an infant differs from that of a lunatic, because he can dispose of personal estate sooner than he can of real.*" In the report in 4 *Brown Ch. Cas.* 238, the chancellor says: "Rents and profits are the fruits of the real estate; they differ very much from other personal estate, and it would be too hard upon the heir to impoverish the real for the benefit of the personal estate."

Lord Loughborough (who, as Wedderburn, was of counsel) made a report of the opinion of Ch. J. De Grey, which is to be found as follows, at 2 *Vesey Jr.* 76, note: "This is a mortgage of the ancestors of the lunatic; but why is it not payable in his life? It is laid down in Freeman in general terms, that incumbrances, without distinguishing whether the ancestor's or his own, are to be discharged. In all these cases, the court makes an election for the lunatic as he would have done if in his senses. What merits have the next of kin? What equity have they? Only that the lunatic would not have applied it so."

This decision represents the English law as it stood on April 19, 1775, and is, therefore, of far more importance in the courts of New York (*Const.* Art. 1, § 17) than any subsequent decision in either England or Ireland. Unless it has been overruled (and although its authority has been questioned, I cannot consider it destroyed), it is substantially decisive of the present controversy.

In *Ex parte* Bromfield, a lunatic's case (3 *Brown C. Ch.* 510; 1 *Vesey Jr.* 453), 1792, Lord Thurlow, after indicating (as above noted) his agreement with Inwood *v.* Twyne and with Grimstone's Case, declined to pass summarily

upon a petition in lunacy for leave to cut timber on a lunatic's lands, and directed the matter to be brought up in equity upon bill and answer, which was done the following year, in Oxenden *v.* Lord Compton, (4 *Brown Ch. C.* 231; 2 *Vesey Jr.* 69; second hearing, 4 *Brown Ch. C.* 397; 2 *Vesey Jr.* 260), July 17, 1801, where Lord Chancellor LOUGHBOROUGH (or Rosslyn, who, as Alexander Wedderburn, had been of counsel for the heirs in Grimstone's Case) decided in favor of the heir, delivering an opinion which, in the principles declared, is destructive of any supposed equity in favor of one class of representatives as against the other.

As this decision was expressly recognized and followed by Chancellor KENT (Matter of Salisbury, 3 *Johns. Ch.* 347), it is in this State worthy of special consideration. Though subsequently criticised in Ireland by Chancellor HART, it was reasserted by his successors, Lord Chancellor PLUNKETT and Sir EDWARD SUGDEN, in cases which will be presently noticed.

The important general principle in the administration of a lunatic's estate was thus formulated by Lord LOUGHBOROUGH (2 *Vesey Jr.* 72): "The orders, that are made by persons charged with the custody of lunatics, are appealable to the king in council. In the whole series of them there is one general principle, though I do not say it is without some possible deviation, that the general object of the attention of the administrator is solely and entirely the interest of the lunatic himself, and, with regard to the management of the estate, solely and entirely the interest of the owner, without looking to the interest of those who, upon his death, may have eventual rights of succession; and nothing could be more dangerous or mischievous than for him to consider how it would affect the successors. There will always be among them an emulation of each other; and their speculations, if the administrator was to engage in them, would mislead his attention and confine his observation as to the interest of

the only person he is bound to take care of.  The next of
kin would contend for a short allowance.  The heir would
have no interest to contend for a small allowance out of
the rents and profits; but might have an accumulation
against the next of kin; and, therefore, where the next of
kin would contend for a narrow allowance, the heir would
insist on a large one.  Therefore the court have always
shut out of their view all consideration of eventual inter-
ests; and considered only the immediate interest of the
person under their care.  If the interests of the succession
were to be respected by the court, I should expect not
only precedents, but a continued course of accounting,
that would manifest it to be the object of the attention of
the chancellor.  There would be a continued running
account between the personal and real estates.  There are
many cases in which it is necessary to apply personal
estate to purposes relating to real estate, as in repairs, &c.
Payment of debts, it is admitted, is so much for the
interest of the owner of the estate, and such pressing cases
might be put, that the chancellor would order the appli-
cation of personal estate to any extent to pay debts.  In
*Ex parte* Grimstone, it was the debt of the ancestor, that
could not affect the person; but it was done upon the
ground that it was what the proprietor in managing his
own property ought in prudence and good sense to have
done.  In the order the chancellor directed it, not *ex
necessitate,* but feeling it to be prudent to disincumber the
real estate, when the personal could afford it; and it was
done in the ordinary course by assignment of the mort-
gage terms in trust to attend the inheritance."

In *Ex parte* Tabbart (6 *Vesey Jr.* 429), August 6, 1801,
Lord ELDON directed coal mines to be worked in order to
raise money to pay off a mortgage and other debts, the
chancellor saying, "The next of kin have an interest that
the coal shall be worked.  The heir at law has no interest;
there have been various remainders over.  Under these
circumstances, I think it may be done by the committee.

It is like cutting timber." It is to be observed that in this case "the master was attended by the next of kin, who were served with notice by the direction of the late lord chancellor" (LOUGHBOROUGH).

In Ware *v.* Polhill (11 *Vesey Jr.* 257, 268, 277, 278), July, 1805, which was an infant's case, Lord ELDON said, that he uniformly made it a rule, where property of one nature had been applied for the benefit of an infant to property of another nature, to have an express provision, that if he shall not attain the age at which he shall have a disposable power, the representative will not be prejudiced in any degree by the act done by the court in contemplation of the infant's benefit in all the circumstances surprise or accident can throw around it.

That this remark was not intended to apply in respect of lunatic's estate is evident from the distinction drawn by Lord ELDON in *Ex parte* Phillips, which is next considered.

*Ex parte* Phillips (19 *Vesey Jr.* 119, 122, 123) a lunatic's case, is directly in the line of Grimstone's case. Three distinct proceedings were had,—two before and one after the death of the lunatic, upon a master's report, as follows: (1.) The master was directed to take an account of the lunatic's debts, and to inquire as to the condition of the timber standing on his estates, and whether it would not be for the benefit of the lunatic and his estate that the same or any part thereof should be sold for the purpose of raising a sufficient sum to liquidate the debts. The master reported that timber should be sold and that the fund thereby produced "should be applied in discharging the debts as far as it would extend; *which was ordered accordingly.*" Here was a direct conversion of realty to pay personal debts without any consideration of the presumptive heirs at law. (2.) Thereupon, on the petition of one of the heirs at law, that he might contract for the redemption of a land-tax upon the lunatic's estate, it was ordered that this might be done, and that redemption

should be made out of the proceeds of the timber, which constituted part of the personal estate.

Here was a direct conversion of personalty to pay charges on the realty without any consideration of the presumptive next of kin. (3.) After the lunatic's 'death, the third proceeding was had upon the petition of the next of kin that the land-tax so redeemed should be declared a charge upon the real estate for the benefit of the next of kin.

This was denied (June 12, 1812) by Lord ELDON, upon the specific ground that there was no equity for a charge in favor of the next of kin, which action and opinion of Lord ELDON must be kept in mind as an authoritative limitation of his subsequent expressions in *Ex parte* Digby.

In this opinion, in *Ex parte* Phillips, Lord ELDON distinguished, beyond possibility of subsequent confusion, the difference between the estate of an infant and of a lunatic; as follows (p. 122) :—" In the case of the infant it is settled, that, as a trustee out of court cannot change the nature of the property, so the court, which is only a trustee, must act as the trustee out of court; and finding that a change will be for the benefit of the infant, must so deal with it as not to affect the powers of the infant over his property even during his infancy, when he has powers over one species of property, not over the other. It may be for the benefit of an infant in many cases that money should be laid out in land, if he should become an adult; but, if not, it is a great prejudice to him; taking away his dominion by the power of disposition he has over personal property so long before he has it over real estate. The court, therefore, with reference to his situation even during infancy as to his powers over property, works the change, not to all intents and purposes, but with this qualification; that, if he lives, he may take it as real estate, but without prejudice to this right over it during infancy as personal property. A lunatic stands on quite a different footing; at the instant of a lucid interval

Adams *v.* Smith.

he has precisely the same power of disposition over one species of property as over the other, in different modes and forms, I admit. The lord chancellor, acting under a special commission from the crown, does what is for his benefit, taking the advice and assistance of the presumptive next of kin and heir as to the management of the property, that may or may not be their own. A case has occurred of a lunatic, seized *ex parte paterna* of estate A., and *ex parte materna* of estate B., the latter being subject to a mortgage; and, timber cut upon A., having been applied in discharge of the mortgage upon B., it was, on a question between the heirs, held that *A.* was not to be recouped. Upon these grounds, had the application been to sell a part of the real estate for the payment of debts, the court, finding that the maintenance of the lunatic would be better provided for, and his advantage promoted by disposing of real estate, inconvenient, ill-conditioned, &c., that it would be for his benefit so to pay the debts, and keep together the personal estate, would have no difficulty in making such an application, and so in cutting down timber upon the estate, augmenting the personal property, it goes as personal property; and the different form of disposition is not regarded when a lucid interval arrives. Upon these principles this sort of distinction, whether solid or not, is settled; and I think there is sufficient to maintain it; but, if settled, I have no inclination to disturb it."

In *Ex parte* Whitbread, in the Matter of Hinde, a lunatic (2 *Merivale*, 99), December 19, 1816 (*Ambler*, 706, note) June, 1822, Sir EDWARD SUDGEN was of counsel and Lord ELDON used language indicative of a principle that governs the court alike in cases calling for conversion of a lunatic's estate, and in those requiring that it be not converted. In each case, the sole guide is the lunatic's interest. Lord ELDON said: "The court does nothing wantonly to alter the lunatic's property, but takes care that *when he recovers he shall find his property as nearly*

*as possible in the same condition as when he left it.*" The caution is exercised out of regard not to the succession, but with reference to the lunatic, whose recovery is always hoped for.

Concerning the appearance in behalf of the presumptive next of kin and heirs at law, Lord ELDON stated the procedure, as follows (p. 101): "For a long series of years the court has been in the habit, in questions relating to the property of a lunatic, to call in the assistance of those who are nearest in blood, not on account of any actual interest, but because they are most likely to be able to give information to the court respecting the situation of the property, and are concerned in its good administration. It has, however, become too much the practice that, instead of such persons confining themselves to the duty of assisting the court with their advice and management, there is a constant struggle among them to reduce the amount of the allowance made for the lunatic, and thereby enlarge the fund which, it is probable, may one day devolve upon themselves. Nevertheless, the court, in making the allowance, has nothing to consider but the situation of the lunatic himself, always looking to the probability of his recovery, and never regarding the interest of the next of kin."

*Ex parte* Earl Digby (1 *Jac. & Walker*, 620), August 4, 1820 (*Jacob*, 235), August 17, 1821, concerning a lunatic—the Duchess of Norfolk—was decided by Lord ELDON.

A charge on the lunatic's life estate being paid off out of her personal property by order of the court, it was directed that the security should be assigned without prejudice to the conflicting claims of the real and personal representatives of the lunatic to the benefit of the payment after the death of the lunatic. In 1821 it was asked who should have the benefit of this payment. No final decision was made by Lord ELDON in the matter, but his opinion was intimated in favor of the next of kin upon

grounds which were afterwards fully discussed and explained by Sir EDWARD SUGDEN (*Drury*, 805).

In view of this discussion by Sir EDWARD SUGDEN, and the previous action of Lord ELDON, in *Ex parte* Phillips, I do not consider this case in conflict with Grimstone's Case, which was not cited by or before Lord ELDON.

In Weld *v.* Tew (*Beatty*, 266), June 15, 1829, Sir A. HART, Irish Chancellor, reversed Lord MANNERS, who, after deciding in favor of the next of kin (*In re* Marriott, 2 *Molloy*, 516; 1808) had in this case changed his opinion and decided in favor of the heir at law. But this decision, coming before his successor, Sir A. HART, was overruled in an opinion which has been accepted as the strongest presentation of the case for the next of kin (see Sweezy *v.* Thayer, 1 *Duer*, 286, 294, 295). It undertook to review and reverse the decision in Grimstone's Case (*supra*), which Chancellor HART declared to have proceeded in disregard of prior authorities, but the chancellor failed to refer to the still earlier decisions in Dennis *v.* Badd and Dormer's Case, already noted, laying down the line to which conformed Grimstone's Case and Oxenden *v.* Lord Compton, which he also overruled.

As this decision of Sir ANTHONY HART is not only contrary to the ruling of his predecessor, Lord MANNERS, but has also been expressly overruled by his two successors, Lord PLUNKETT and the distinguished Sir EDWARD SUGDEN (afterwards Lord ST. LEONARDS), in cases hereafter noted, it can hardly require separate discussion by me. It is of no authority in Ireland, the country where it was rendered, and the destructive criticisms in the two noted overruling decisions deprive it of influence in other jurisdictions. I content myself with referring to those criticisms, for I may not assume to be able to add to their force or sharpen their edge (see Newcombe *v.* Newcombe, *Drury*, 358; 3 *Irish Eq.* 414; Earl of Leitrim *v.* Enery, *Drury*, 330; 6 *Irish Eq.* 357). Of course, if Sir ANTHONY HART was right, then Grimstone's Case should not be law in Ireland

or elsewhere; but as Grimstone's Case still continues to be the law in Ireland, it would be strange if the contrary rule in Weld v. Tew were to be given, in New York, an authority denied to it in Ireland.

*In re* Badcock (4 *Mylne & C.* 440), May 25, 1840, Lord COTTENHAM held that "the ordinary repairs upon a lunatic's real estate will be directed to be borne by the personal estate; but any extraordinary outlay of the personal estate on the land should retain its character of personalty." This observation has no applicability to the payment of a lunatic's debts.

In Newcombe v. Newcombe (*Drury*, 358; 3 *Irish Eq.* 414), February, 1841, Lord Chancellor PLUNKETT elaborately overruled his predecessor, Sir ANTHONY HART, in Weld v. Tew (*supra*), and held that the next of kin of a lunatic had no equity to have kept alive, for their benefit, a mortgage upon the lunatic's realty previously assigned to the committee in trust for the lunatic in consideration of payment from his personalty. He reviewed all the authorities, and concluded that the concurrent and direct decision in Grimstone's Case by Lord NORTHINGTON, Lord APSLEY and Chief Justice DE GREY, subsequently supported by Lords ROSSLYN and THURLOW, was not only well founded in principle, but was supported by adequate judicial authority, and that it was not shaken by Weld v. Tew. He carefully considered and distinguished Lord ELDON's conclusion in *Ex parte* Earl of Digby (otherwise the Duchess of Norfolk's case), and considered it as proceeding in view of the special circumstance, that the charge or lien there to be discharged was upon a life estate, and not upon a fee belonging to the lunatic, and upon the principal question he observed that "where the charge is paid off in the lifetime of the lunatic, who was the absolute owner of the estate charged, the law considered that payment as having been made in exoneration of the estate for the benefit of the real estate. . . . The law attributes the same effect to causes of this nature

done for persons laboring under disability, and I am not aware that any distinction has been held to exist on that account." (See p. 372.)

The chancellor further considered the concession that if the payment of the charge in question had been made by the authority, and with the permission of the court, that would have prevented any question; and he concluded that, inasmuch as the payment of these obligations had been included in the accounts of the committee and allowed by the master in passing, the account was equivalent to an original application to the court for its approval and the granting of such application.

This consideration will be found to have especial importance in the case now under consideration.

In Earl of Leitrim *v.* Enery (*Drury*, 330; 6 *Irish Eq.* 357), January, 1844, the chancellor, Sir EDWARD SUGDEN, considering the two prior decisions as leaving the law open by reason of their conflict, carefully and at length examined the whole question, and concurred with his predecessor, Lord PLUNKETT, again overruling Weld *v.* Tew, and again recognizing Grimstone's Case and Oxenden *v.* Lord Compton.

In this case, the person who had been found a lunatic was seized of an estate in fee, subject to a charge pending the lunacy. The owner of the charge applied for payment thereof, whereupon an order was pronounced in the lunacy matter, whereby it was referred to the master to inquire and report whether it would be for the benefit of the lunatic that any part of the charge should be paid off, and, if so, out of what funds the payments should be made. The master reported that it would be for the benefit of the lunatic that the charge should be paid, and that such payments should be made out of the funds to the credit of the lunacy matter (consisting of the savings of the real estate). The court directed the charge to be paid off, and ordered it to be assigned to a trustee in trust to attend the inheritance or for the lunatic, his executors.

and administrators, as should be thereafter determined, without prejudice to any question which might arise upon the death of the lunatic, between his heirs at law and next of kin. To conform with this order, the charge was paid off and assigned to a trustee, and the lunatic subsequently died intestate.

Upon a bill filed by the plaintiff, one of the next of kin, and also the personal representative of the lunatic, claiming the benefit of the charge, *held*, that there was no equity in favor of the next of kin, and that the heir at law was entitled to hold the estate freed from charge.

Sir EDWARD SUGDEN carefully and elaborately reviewed all these authorities, and, in reaching his decision, expressed his views as follows:

"Now, in the ordinary case of a man seized in fee of an estate subject to an incumbrance, if he have money unemployed, he is more likely to apply it in discharge of the incumbrance than to invest it in other securities, and to him it must, in general, be indifferent whether the incumbrance was created by himself or his predecessor. Undoubtedly, cases may arise where, in such circumstances, the owner would keep the charge on foot,—for instance, to retain the priority over other charges,—but, in my experience, I have not known one instance of an owner in fee of an estate keeping alive a charge which he has paid off for any other purpose. The chancellor, acting, therefore, as the lunatic sane would no doubt act, may properly apply the general personal estate in discharge of any incumbrance on the estate, if it be for the lunatic's benefit, without regard to his being personally liable or not to the payment of the debt; and this may be done so as to benefit eventually the heir at the expense of the next of kin; and, of course, as in Dormer's Case, if the rents are not required for the maintenance of the lunatic, the estate may be made to discharge its own burden by an appropriation of the rents; or, if they have been saved, issuing, as they did, from

the realty, although becoming personalty when received, they may be applied to the redemption."

*In re* Leeming, a lunatic (3 *De G. F. & J.* 43), January 25, 1861, Lords Justices BUNCE and TURNER, in a very brief opinion, barely stating the decision, without reference to any precedent, and upon the basis of a special statute (Lunacy Regulation Act, 1853; 17 and 17 Vict. ch. 20, § 118; see *L. R.* 22 *Ch.* 628), decided for the next of kin, and having directed the payment of a mortgage out of a lunatic's personalty, without prejudice to the question how it should ultimately be charged, eventually held that the money ought to be raised out of the real estate and restored to the administratrix as personalty.

The fact of a preceding order that an assignment of the mortgage be taken in trust is, in the best English opinion, sufficient to distinguish this class of cases from those in which no assignment had been taken. This distinction is hereafter considered.

*In re* Gist, a lunatic (*L. R.* 5 *Ch. Div.* 881; 22 *Moak's Eng.* 534), June 4, 1877, BAGGALLAY, Ch. J., observed the distinction already noted between cases involving the fee and those concerning only a life estate. The heirs and next of kin both appearing before the court, an order was made directing repairs and permanent improvements upon the lunatic's life estate, through mortgage thereof, *and upon his fee out of his personal estate.*

In *In re* Barker (*L. R.* 17 *Ch. Div.* 241–245), January, 1881, decided by Lord Justice COTTON, a lunatic's share in partition had been paid into court, and after his death his administrator claimed the money as personalty, but, upon the basis of the statute, the court held that it continued realty, the sale having been a compulsory proceeding, in which the interest or benefit of the lunatic did not enter as a factor. The decision does not conflict with the claims of the heirs at law now on trial.

Grimstone's Case seems to have been neither cited nor considered upon the hearing, and the language of COTTON,

L. J., with reference to the consideration to be given by the court to moneys paid into court in lunacy, as the proceeds of the realty, without being carried to the real estate account, is inapplicable to the question of the payment of the lunatic's debts, a matter which was neither discussed nor considered in this case.

*In re* Freer (*L. R.* 22 *Ch. Div.* 622), December 18, 1882, decided by CHITTY, J., in no wise concerned the question now presented. Oxenden *v.* Lord Compton was cited upon another point, but with approval. The decision *In re* Leeming was explained, as before observed (*supra*).

In view of these thirty-one English and Irish cases expressing the varying and conflicting views of some of the most illustrious lawyers and judges, it is impossible to assert that the courts agree in recognizing an equity in favor of one representative as against the other, in any case where a lunatic's committee, in good faith, has converted personalty into realty. The preponderance of authority seems to be that, in such case, there is no such equity. Unless the party asserting the equity is able to establish affirmatively, first, that there is such a rule in equity; and, secondly, that his condition entitles him to its application, he must, of course, be left to his strict legal right, which, in such a case as that now before the court, would be to participate as next of kin in only that which was actually personalty at the time of the lunatic's death.

The effect of these English and Irish cases is considered and well stated in *Pope's Law of Lunacy* (London, 1877), the most recent English treatise on the subject, and a work of evident accuracy and merit, in the following language, which I adopt as an expression of my own understanding of their result: "The books exhibit a strange conflict of opinion as to whether the discharge of incumbrances should inure for the benefit of the real estate or not, and the time at which this question should be decided. The following rules may be taken to represent the modern state of law on the subject: (*a*) The court will usually,

at the time of the discharge of the incumbrance, declare the expenditure a charge on the particular property for the benefit of the general personalty, and direct a mortgage to some person as a trustee to preserve the charge; (*b*) In doubtful cases, the court will leave the question open, without prejudice to either interest, by directing a transfer to a trustee upon trust for the lunatic, his heirs and assigns, or the lunatic, his executors, administrators or assigns, as the lord chancellor in lunacy or the high court, in any action to be instituted for the purpose, may direct; (*c*) Where the question is neither decided by declaration of a charge nor expressly reserved, the person entitled, after the death of the lunatic, takes the property as he finds it, discharged from the incumbrance" (p. 157).

Passing now to a consideration of the American authorities, I may first refer to citations made before me from the decisions of two distinguished judges of other States.

The case of Lloyd *v.* Hart (2 *Penn. St.* 473), decided May 12, 1846, was as follows: A lunatic's realty having been sold under decree for payment of debts, and surplus having resulted, upon his death the heirs at law contended that this surplus was realty. The court below (Lewis, P. J.) held otherwise, but was reversed on the ground that, independently of statute, the committee had no right to sell realty; that the Pennsylvania statute gave a committee this power *only* for the purpose of maintenance and payment of debts, and that any surplus remaining " when that was accomplished retained the impress of real estate." But, at the same time, the very learned court (Gibson, Ch. J.) recognized the tendency of the English decisions, and also the contrary rule in case of a conversion of personalty (as distinguished from realty) in the following language, evidently based on Oxenden *v.* Lord Compton: "The conversion of a lunatic's personal estate into real seldom calls for a chancellor's interference with its legal consequences, because it is the principal, if not the only, duty of the committee to provide for the lunatic's per-

sonal comfort and interest, without regard to the ulterior and conflicting interests of those who may be entitled to succession, a respect for which, it is said, might divert the attention of the committee from its proper object. It would be the interest of the next of kin to have the lunatic put on the smallest possible allowance out of the personal estate and the profits of the land, while it would be the interest of the heir to have as much of it as possible expended in improvements and repairs; and by attempting to do justice between these eventual interests, the present estate of the lunatic, who is entitled to the produce of the whole estate in the way most beneficial to himself, might be prejudiced. Beside, it is said, if those interests were respected, there would be a running account between the personal and the real estate which it would be almost impossible to adjust on any equitable principle whatever. For these reasons they are, for the most part, put out of view, and the property is allowed by the chancellor to retain the legal character stamped on it by the committee. But the principle of non-intervention does not universally hold, for a wanton conversion to favor the heir or the next of kin will be undone, and the delinquent committee perhaps punished for a breach of his trust; but, it is said, there is no equity on any narrower ground. . . . It seems to be a principle of policy indicated by acts of legislation in England to protect the lunatic's land from unnecessary conversion; and in this respect there would seem to be a difference there between real and personal estate."

The other American case cited before me was that of of Paul *v.* York (1 *Tenn. Ch.* 547), decided April, 1874, by Chancellor COOPER. This, however, was a case not of lunacy, nor of the payment of debts, but was solely as to the nature of certain real property left by two deceased infants whose guardian had purchased the same for them during minority out of their personal estate. The chancellor held that the real estate thus acquired was im-

pressed with the character of personalty. His decision proceeded especially in view of the decision and legislation of Tennessee, although at great length he reviewed nearly all the authorities, in course of which he recognized the different rule governing lunatic's estate, as to which he said (p. 553): "This case" (Awdley *v.* Awdley, 2 *Vern.* 192) "is the more remarkable as it has been since generally held that in cases of lunacy there is no equity between the real and personal representatives, 'but the interest must be taken as fortune has directed.' Lord LOUGHBOROUGH, in Lord Compton *v.* Oxenden (2 *Vesey Jr.* 265; see *Id.* 69; 3 *Brown Ch. C.* 510; 4 *Id.* 397; and under the style of *Ex parte* Bromfield, 4 *Vesey Jr.* 453. Lord ELDON uses substantially the same language in *Ex parte* Phillips, 19 *Vesey, Jr.* 123, drawing a distinction in this regard between the estate of a lunatic and the estate of an infant."

It thus appears that outside of New York no cited American authority calls for the application of a rule different from that deduced by Mr. Pope from the English decisions.

We may now come to a consideration of our own authorities (although of course among these we must include the English decisions terminating with Grimstone's Case, which was our law April 19, 1775—Const. art. 1, § 17.

In the Matter of Salisbury (3 *Johns. Ch.* 347), Chancellor KENT following the reasoning in Oxenden *v.* Lord Compton (based on Grimstone's Case) granted the application of a lunatic's committee to sell standing timber, and observed that "it is settled that the property of a lunatic may be converted from real into personal when it shall appear to be for the interest of the lunatic, without regard to the contingent interests of the real and personal representatives. The governing principle in the management of the estate is the lunatic's interest, not that of those who may have eventual rights of succession . . . So likewise the court may authorize a change of the prop-

erty of infants from real into personal, and from personal into real, when it is manifestly for the infant's benefit.

Concerning this opinion, which has never been overruled, the only adverse comment in the present case is that made by the learned counsel for the defendant Sidney J. Smith, who say that it is a decision under the general equitable powers of a court of equity prior to the Revised Statutes. The Revised Statutes, however, in precise terms laid down the cases in which a court of equity should have power to convert a lunatic's property from realty to personalty, and *vice versa.*"

Upon this suggestion I have sought, but have been unable to find any statutory provision forbidding the use or conversion of a lunatic's personalty in payment of debts, and I cannot but think that the learned counsel have inadvertently erred in thus describing the effect of any statute or rule concerning lunatics.

There was never in this State, so far as I can find, any statute forbidding or limiting the use or conversion of a lunatic's personalty; and the provision as to the sale of lunatic's realty (2 *R. S.* 53, § 11 ; see *Code C. P.* § 2359) certainly as old as 1801 (Gorham *v.* Gorham 3 *Barb. Ch.* 24), binds only a committee and not the court (Foreman *v.* Foreman, 7 *Barb.* 215 ; Wood *v.* Mather, 38 *Barb.* 473).

· Subsequently to the revision of the statutes, all judges have considered the power of the court unrestricted, as appears first from the decision of Chancellor WALWORTH (in 1842) in the Matter of Livingston (9 *Paige*, 440), granting an application for leave to invest a part of a lunatic's estate in buildings or other improvements on her unproductive real estate. The chancellor said: "There is no difficulty in granting so much of the prayer of the petition as asks for permission to apply the surplus income of the lunatic's property to the improvements of the unproductive real estate. The committee may also be authorized to apply a reasonable portion of the capital of the

personal estate, to the extent of $20,000 or $25,000 if she shall deem it expedient to do so, in building upon such of the vacant lots as are so situated as to produce an immediate and fair income from such improvements."

Chancellor KENT's decision in Matter of Salisbury (3 *Johns. Ch.* 347), adopting the ruling in Oxenden *v.* Lord Compton, that "the governing principle in the management of the estate is the lunatic's interest, not that of those who may have eventual right of succession," has been frequently and continuously cited with approval (See Matter of Burr, 17 *Barb.* 1, 15; Lewis *v.* Jones, 50 *Barb.* 645, 663; Matter of Colah, 3 *Daly,* 529, 539; Matter of Owens, 5 *Daly,* 288, 294).

With one exception there was cited before me no other New York case directly involving a lunatic's estate; and these leading precedents in lunacy established by our two famous chancellors, in harmony with the soundest English authorities, indicate a principle of administration not to be disregarded by me unless they have been deliberately overruled by competent judicial authority, which is not the fact.

The one other New York case actually involving a lunatic's estate was that of Cutting *v.* Lincoln (9 *Abb. Pr. N. S.,* 436), in which a learned referee, rightly deciding that the proceeds awarded to a lunatic upon partition sale of land continued to be realty (because, as he observed, p. 441, the sale was not procured at the instance or for the benefit of the lunatic), incidentally adopted from Sweezy *v.* Thayer (*infra*), a general statement concerning the considerations governing a change in a lunatic's estate (whose origin we have already traced). He referred to Chancellor KENT's opinion in Matter of Salisbury (*supra*) not to condemn it, but to distinguish it from that before him and from Sweezy *v.* Thayer. His decision in no wise affects the question in this case.

The case of Sweezy *v.* Thayer (1 *Duer,* 286) just mentioned concerned the foreclosure sale of mortgaged prem-

ises in which an infant owned the equity of redemption. The court, under the rule already considered, held that an infant's share of the surplus moneys was to be considered realty during his infancy, and, upon his death, under age, went to his next of kin.

The referee, in the course of his discussion of the infant's rights, discussed at some length (pp. 294–5) by way of illustration and approval, the opinion of Sir Anthony HART, above cited, in Weld v. Tew (*Beatty*, 270). But as he failed to observe that Chancellor HART had already been twice overruled, and as no reference was made to the principles established by the decision of Chancellors KENT and WALWORTH, already cited, I cannot regard their procedure in lunacy discredited merely by this illustrative statement of the referee in a case dealing with infancy.

The cases of Foreman v. Foreman (7 *Barb.* 215; rev'd., Forman v. Marsh, 11 *N. Y.* 544), and Wood v. Mather (38 *Barb.*, 473), distinctly and avowedly deal with infants' estates only, and are not in any way decisive upon any question as to lunatics' estates.

Upon this consideration of all the New York authorities, I fail to observe any decisive disposition to overrule the authority of Grimestone's Case, taken over into our own body of law at the Revolution by our constitution (art. 1, § 17). And so far as subsequent English and Irish decisions may serve as instructive discussions of the law, it is evident that our highest authority has pronounced in favor of the rule recognized in Oxenden v. Lord Compton. But even if the whole body of those foreign decisions is to be regarded in connection with our own, then I concur with Mr. Pope in his statement of the result of those authorities as applicable to this particular case in the State of New York, viz., "When the question is neither decided by declaration of a charge nor expressly reserved, the person entitled after the death of the lunatic takes the property as he finds it, discharged from the incumbrance."

This doctrine is attacked by the learned counsel for Sidney J. Smith upon two special considerations deserving comment: 1st. That equitably an assignment of the mortgages ought to have been taken by the committee, and that, though this was not done, it must now and here be considered to have been done, because " equity regards that as done which ought to be done." 2d. That the adoption of a different " doctrine will result in all cases of this kind in a controversy as to who shall possess himself of the committeeship of the lunatic."

Referring to this last objection first, it is sufficient to observe that whenever an interested or wanton act by a committee shall be shown, the unbroken line of authority will sufficiently support a court of equity in undoing such an act. And as long as the rule of disinterestedness on the part of the committee is observed, it is on the whole better to accept the results upon the next of kin of his impartial acts for the benefit of the lunatic than to reduce his administration to a constant struggle with the two classes of possible representatives as to how the lunatic may be supported most agreeably to them. It is undisputed, indeed it is proved in this case, that the committee was disinterested, and there is no suggestion that he acted otherwise than in good faith.

As to the first objection, founded on the maxim, " equity regards that as done which ought to be done," it is to be considered that this maxim is not to be extended beyond its terms, and is applicable in respect of those cases in which it is clear that an omitted act *ought* to have been performed as distinguished from the mere possibility that it *might* have been performed.

Prof. Pomeroy (*Eq. Jur.* § 365), thus elucidates this maxim :—" In the first place, it should be observed that the principle involves the notion of an equitable *obligation* existing from some cause, of a present relation of equitable right and duty subsisting between two parties, a right held by one party, from whatever cause arising, that

the other *should* do some act, and the corresponding duty, the *ought* resting upon the latter to do such act. Equity does not regard and treat as done what *might* be done or *could* be done, but only what *ought* to be done. Nor does the principle operate in favor of every person, no matter what may be his intention and relations, but only in favor of him who holds the equitable right to have the act performed as against the one upon whom the duty of such performance has devolved." He cites Sir THOS. CLARKE, M. R., in Burgess *v.* Wheate (1 *W. Bl.* 123, 129 ; 1 *Eden,* 177), as follows :—"Nothing is looked upon in equity as done, but what ought to have been done ; not what might have been done. Nor will equity consider things in that light in favor of everybody; but only of those who had a right to pray that it might be done."

Now, it is readily conceivable that the committee *might* have taken an assignment of these mortgages, but under this sound reasoning of Prof. Pomeroy this mere possibility is not sufficient to sustain the claim now submitted for an equitable conversion, unless the committee *ought* to have taken such an assignment.

Upon the authorities already cited, I cannot find that he *ought* to have taken an assignment of the mortgages instead of paying them, nor is such a conclusion required by any statute or decision of this State concerning an estate situated as this was in the hands of the first committee.

As already observed, that committee found the lunatic possessed of nine parcels of real estate set off to him upon the partition of his ancestor's estate, five parcels being subject to mortgages made or assumed by Jonathan Hunt to secure the payment of about $59,000. Other mortgages similarly affected the portions of the other parties to the partition suit, no injustice to the lunatic being apparent in this respect by the decree in partition, which expressly provided that the several mortgage debts

incumbering the various parcels should be paid by the respective recipients thereof.

In this particular the decree in partition merely expressed the obligation imposed by statute (1 *R. S.* 749, § 4; 3 *Id.* 7 ed. 2205) upon an heir or devisee of real estate, subject to a mortgage executed by any ancestor or testator to satisfy and discharge such mortgage out of his own property, without resorting to the executor or administrator of his ancestor.

This liability of the heir was one that could be enforced, either against the mortgaged property by a foreclosure of the mortgage, or, at the option of the mortgage creditor, in the first instance by an action upon the bond. See Roosevelt *v.* Carpenter, 28 *Barb.* 426, 429, 430, 431 ; Thompson *v.* Sullivan, 60 *How. Pr.* 71; Rice *v.* Harbeson, 2 *Supm. Ct.* (*T. & U.*) 47; aff'd, 63 *N. Y.* 493.

A further provision sufficient to bind all real estate inherited by the lunatic from his ancestor Jonathan Hunt for any debt of Jonathan Hunt, arising by simple contract or by specialty, may be found in the Revised Statutes (2 *R. S.* 452, § 32 ; 3 *Id.* 5 ed. 750).

And the personal estate of Sidney Smith was also by statute made liable to pay the debts of the deceased Jonathan Hunt to the extent of any assets received from him (See 2 *R. S.* 90, § 42; 3 *R. S.* 5 ed. 177, § 42).

It cannot be doubted that it was not only the right, but the duty of the committee, so far as he could, to pay the debts of the lunatic as they fell due; for, as was observed by Chief Justice De Grey in his opinion already cited (*Ex parte* Grimstone, 2 *Vesey Jr.* 76, note:   " It is laid down in Freeman in general terms, that incumbrances, without distinguishing whether the ancestor's or his own, are to be discharged." Nor can it require extended citation of authority to support the proposition that debts *should be discharged* as they fall due, by the debtor, if competent, or by his legal representative if he be incompetent.   To the representative of a lunatic, as well as

to his charge when recovered, applies the injunction, "Owe no man anything," and the "law says that it is for the benefit of the absolute owner of an estate that a charge affecting it should be paid" (Lord PLUNKETT, Newcombe v. Newcombe, 3 *Irish Eq.* 414).

The learned counsel for Sidney J. Smith, contending that if paid at all these debts should not have been paid from personalty, say that "the committee of the lunatic was not *bound* to pay these mortgage debts out of the personalty. On the contrary, it was more convenient to him to pay them out of the personalty. That is all. Following the rule of exoneration, his duty was to pay them out of the realty, because they were a primary charge on the realty and not a primary charge on the personalty."

This proposition is, however, in conflict with the rule laid down by Chancellor WALWORTH in the Matter of Pettit (2 *Paige*, 596), where he decided that no power to order the sale of real estate for the payment of debts, or for the purpose of maintaining the lunatic, had been given to the courts by the statute so long as the personal property of the lunatic was sufficient for that purpose. In other words, the real estate of a lunatic cannot be sold for maintenance or for the payment of debts, until not merely the income, but the capital of the personalty has been exhausted in support of the lunatic, or at least until the court can see that it must, in the natural course of events, be exhausted.

Under this New York rule, therefore, it was proper for the committee of the lunatic to use and to continue to use the personalty until exhausted in payment of the lunatic's debts before resorting to the realty, and in the petition filed by the committee in 1850, it appears that before seeking to sell any of the realty of the lunatic, he had arranged to apply all of the then existing personalty in part payment of the mortgage debts.

Additional support for the propriety of such payments may be found in the case of Banks v. Taylor (10 *Abb. Pr.*

Adams *v.* Smith.

199, 202). In that case, which concerned the accounts rendered by the guardian of an infant, it appeared that the guardian had, from the personal estate, discharged a mortgage executed, in his lifetime, by the father of the infant, upon property which the infant had inherited. It was held that such payment was properly made; the court at general term saying (p. 202), that it was the duty of the infant, under the statute, to satisfy the mortgage, and therefore the duty of her guardian to do it for her, and the appropriation for that purpose, although it diminished to that extent the personal property for the benefit of the real, was binding on the infant, and, of course, on her next of kin. "It was an appropriation of the property of the ward to pay an obligation which the law had made the debt of the ward, and which it had declared it her duty to satisfy and discharge out of her own property without specifying whether real or personal, and which the guardian, therefore, it being most beneficial to the ward, was authorized and bound to discharge out of that which was most convenient and at the same time most insecure, the moneys in hand."

In view of these considerations, it is difficult to discover any ground upon which to base justifiable criticism of the action of the committee in making payment of these debts from the personal estate, as he was entitled to do without an order of the court (Pickersgill *v.* Read, 5 *Hun*, 170).

And unless the committee in paying these debts did something that he ought not to have done, there is, as we have seen, no occasion for the application of the maxim, "Equity regards that as done which ought to be done."

The situation is one fairly within the general rule stated by a high authority (*Shelford on Lunacy*, 299), as follows: "Where the committee or guardian is entrusted with the care of an estate, *and has abused that trust* with a view of changing the quality of the estate, *to serve his own interest*, there arises an equity to undo the act tortious in that

way: *there is no rule of equity upon, a less ground than that.* . . . . It is clearly established that when a person is acting *bona fide* for a lunatic or an infant without any intention to prefer either representatives, there is no equity between them: *there is no rule in equity to undo the act unless there has been a breach of trust in the committee or guardian.*"

But the propriety of the committee's action in paying the mortgage debts from personalty is not a matter of inference merely.; it has twice received the sanction of the court.

In 1850, the committee informing the court that he had used all the personalty so far as it would go in payment of these debts, asked leave to sell the unimproved and unincumbered real estate in further reduction of the incumbrances of the improved property. The court carefully considered all the facts and gave directions to sell the designated parcels, thus clearly indicating the propriety of continuing to provide for the remaining incumbrances out of the personalty.

This the committee continued to do, completing the last payment in 1863. In 1865 he presented to the court his final accounts, which showed that he had made all these payments and (except as to the proceeds of the four parcels sold in 1850) had made them out of personalty. The court approved his accounts, and consequently his action, and ordered his discharge.

After the lapse of twenty-two years it is too late to question the effect of this judicial approval of this action of the committee.

The effect of such a passing of accounts was, as already observed, in Newcombe *v.* Newcombe (3 *Irish Eq.* 414), declared by Lord PLUNKETT to be equivalent to a prior order directing such payments.

The suggestion of the learned counsel for Sidney J. Smith, that such judicial proceedings should not be considered as binding, because no one was authorized to file

exceptions or raise a controversy; and because the next of kin, if appearing, would have been disregarded, must have been made without attentive consideration of the fact that, in almost every proceding from Dormer's Case in 1724, to *Re* Gist in 1877, the next of kin have appeared, and that the practice was the special subject of Lord ELDON's observation in *Ex parte* Hinde (2 *Merivale*, 101): facts considered by Mr. Pope in his *Law of Lunacy*, such appearances in England being now the subject of a rule, which did not originate but merely seeks to regulate them.

If this were otherwise, and the next of kin had had no right or privilege to appear, this would have been only because their mere expectations were without sufficient legal consequence to warrant any consideration by the court then, and much less now, for it is inconceivable that at this late day a court should order that to be done which it would not then have ordered upon the mere suggestion of any party having an interest, however slight or remote.

There is, in my opinion, no legal ground upon which to sustain the claim of these next of kin, which, as acutely observed by the learned counsel for the plaintiff, "is based upon the assumption that their share is less than it otherwise would have been, and not upon the assumption that the action taken was not beneficial to the lunatic's estate or was not such action as he himself would have taken."

As to the claim for moneys paid out by way of repairs, I must also hold against the next of kin. The amount paid was on the whole inconsiderable; was not for betterments, in the sense of permanently improving the property, but was used with a view to keeping the property in a tenantable condition so as to earn the rents which presumably have gone to swell the personalty about to be distributed among the next of kin. They have shown no sufficient ground for criticising the action of the com-

mittee in making the repairs or in paying for them, as was done.

[Concluding with directions as to draft of report and settlement of findings.]

NOTE ON SPECIAL CLAUSES IN JUDGMENTS FOR PARTITION.

The jurisdiction of the English court of chancery was assumed by that court in the exercise of its inherent power, to give relief to cotenants when the equities between them, the situation of the property, or the capacity of the parties in interest, were such that the common-law courts could not direct the sheriff to make an actual partition which would do justice to all.

Chancery did not assume the power of a court of law to act upon the title and direct the sheriff to allot and deliver possession in severalty; but it acted on the parties, and adjusted all the equities of whatever controversy there might be between them, excepting only dispute as to legal title, as to which dispute, if it arose, chancery suspended proceedings till it was determined by a suit at law. Legal title being conceded or established, chancery adjusted all the equities of the parties before it, and fixed on an allotment as nearly equal as practicable, and then gave relief by directing the parties to convey accordingly, and to make such payments for equality, and enter into such conditions or covenants as necessary to equity; and by its decree could at the same time determine all incidental questions, for the very reason that a court of law could not do so.

After a considerable period, during which, under legislation prior to the Codes, the remedy in this State has been, at the option of the claimant, a special statutory proceeding in a court of law, or a bill in equity, it is now put on a footing more analogous to the ancient jurisdiction of chancery, the remedy being by civil action, in which, so far as special regulations do not guide (*N. Y. Code Civ. Pro.* §§ 1532–1595), the court has the general powers of chancery.

The following special clauses are selected from recent precedents in the collection of the writer in view of their useful-

ness as precedents for the practitioner.   The circumstances of each case in which it is proposed to follow any of them will usually suggest useful modification.

*That will is void.*] It is ordered, adjudged and decreed, that [the residuary clause of the] last will and testament of said M. N., deceased, is void, and that the title to said lands and premises vested in his heirs at law as though he had died intestate, and that the parties to this action are seized and entitled &c.

[See Hewlett *v.* Wood, 55 *N. Y.* 634; Hall *v.* Hall, 13 *Hun,* 306.]

*A party adjudged without title.*] That the defendants W. X. and Y. Z. have not, nor has either of them, any right, share, interest or lien, of, in or to the premises described in the said complaint or any part thereof.

*Cloud on title removed.* And that the several certificates of sale of which the defendants W. X. and Y. Z. are the owners and holders, which are respectively set forth in paragraphs       of the answer of the said W. X., and also the said several certificates of sale of which the said defendant Y. Z. is the owner and holder which are respectively set forth in paragraphs       of the said complaint are each and all null and void.

[See Barnard *v.* Onderdonk, 98 *N. Y.* 158; Halstead *v.* Halstead, 55 *N. Y.* 442; Bergen *v.* Snedeker, 8 *Abb. N. C.* 50, 56; 'S. C., as Bergen *v.* Carman, 59 *N. Y.* 146; Henderson *v.* Henderson, 44 *Hun,* 420. See *Code Civ. Pro.* § 1562, Mr. Throop's note.]

*Cancellation of deed in contravention of trust.*[1]] That the sale of the premises in question and described in the complaint of the plaintiffs, made by the late M. N., deceased, as executor of the last will and testament of O. P., deceased, to the defendant W. X. was in contravention of the trust committed to the said M. N., as such executor, by the testator.   That the said sale has not been affirmed by the defendants.[2]

That such sale be set aside, and the deeds of the said M. N. executor as aforesaid, to Q. R. and from said Q. R. to said premises executed by the said W. X. be and they are hereby set aside, and the register of the county of       is hereby directed to make a note upon the record of each of the said deeds in his office that the same is set aside and annulled by the judgment of the court.

[1 See Hammond *v.* Cockle, 2 *Hun,* 495; S C., 5 *Supm. Ct. (T. & C.)* 56; Boerum *v.* Schenck, 41 *N. Y.* 182 ; 3 *R. S.* (7 ed.) 2183, § 65.

2 Boerum *v.* Schenck, 41 *N. Y.* 182.]

*Annulling power of sale.*] That the power of sale contained in the will of M. N. deceased, be and the same is hereby terminated and at an end,

and that said executors and trustees and each of them shall no longer exercise such power nor act as trustees thereunder.

*Appointment of substituted trustee.*] That a trustee be appointed by this court to make a prompt sale of the said premises in question, and distribute the proceeds thereof agreeably to the existing rights of the respective parties as declared herein by this court. And it is further ordered and adjudged that it be referred to R. F., Esq., to select and report to this court a proper person to be appointed such trustee and to report the amount of the bond which ought to be given by such trustee for the faithful execution of the trust to be reposed in him.

[Where the trustees of an estate were dead, and there was a question whether the legal estate had descended in trust,—*Held*, that a decree of sale in partition might declare that any persons to whom the trust descended be removed, and might appoint a master as such, and also as trustee to execute the conveyance. Cushney *v.* Henry, 4 *Paige*, 345.]

*Failure of power of appointment.*] And the defendant W. X. having died without having exercised the power of appointment authorized by the said will of M. N.; deceased, and his share in said lands having passed to his three children, the defendants, T. X., U. X., and V. X.,— It is ordered and adjudged that said referee pay over to the said three children of S. M. L., deceased, share and share alike, one part of the net proceeds of said sale, absolutely as in fee.

*Seizin subject to taxes and leases.*] That the plaintiff A. B. is the owner and is seized of one undivided part of said parcels of land, subject, nevertheless, to the taxes and corporation leases *and the tenants' leases* hereinafter referred *to, and so on.*]

[The estate of each known owner, or of the defendants or some of them, collectively, when their rights between each other are disputed [3 Johns. Ch. 302], should be stated in the judgment. But a statement that certain definite portions belong, collectively, to owners who are unknown, is sufficient and they may be described in general terms, as descendants of a person deceased. Hyatt *v.* Pugsley, 23 *Barb.* 285.

Clause establishing lien of creditor of the estate in virtue of charge in the will. Hibbard *v* Dayton. 32 *Hun*, 220.]

*Remainders subject to open After usual statement of interests of the parties.*] That all of said remainders not yet vested in possession by the death of the parents of those entitled in remainder, are liable, during the life of such parent, to be opened to let in after-born children who will be entitled to take, share and share alike [*or* to share in so much of the proceeds of the sale hereby directed to be made as represents the said remainders].

Note on Special Clauses in Judgments for Partition.

[As to protecting interests of unborn remaindermen, see Rockwell *v.* Decker, 33 *Hun*, 343; Monarque *v.* Monarque, 8 *Abb. N. C.* 102, 117; S. C., 80 *N. Y.*, 320, and 1 *Am. Prob. R.* 494; rev'g 19 *Hun*, 332 and overruling Monarque *v.* Requa, 53 *How. Pr.* 438.

Interest of beneficiary in share held in trust, protected by a direction in the judgment for payment to the trustees of a proportionate share of the proceeds of the sale. Rockwell *v.* Decker, 5 *Civ. Pro. R.* (*Browne*), 62.]

[*Remainder subject to be directed.*] And the interest of each of such grandchildren of the testator M. N., deceased, as tenants in remainder of the premises [*designating them;* or of the proceeds of the sale herein ordered to be made] is liable to be divested by the due execution of the power of appointment given by the will to his or her parent, or by his or her death without leaving issue before such parent's death.

[McCabe *v.* McCabe, 18 *Hun*, 153. See also, 22 *Moak's Eng.* 322, *n.*, citing other cases. Compare *Code Civ. Pro.* § 1589.]

*Direction to determine the rights of the parties to a share of the rents.*] That after the sale of said premises said referee take testimony and determine the right of one or more of the parties as against any other party or parties, by reason of the receipt by the latter of more than his, her, or their proper proportion of the rents to a share or part of a share of said premises, and to ascertain and determine the liability of any party to account therefor to any other party herein, and to take testimony and determine the rights of all parties respecting the disbursements, expenses and services in and about the renting and collection of any rent of said premises by any of the parties to this action.

*Judgment against claim for expenses and use and occupation.*] That the defendants W. X. and Y. Z. are not entitled to recover or to be allowed any sum in this action on account of moneys paid and expended by them for insurance, taxes, repairs or improvements upon said property and that they are not liable for the value of the use and occupation, or for the rental value of said property.

[The share of a tenant in common arising upon a sale in partition, may be charged with amounts expended by a co-tenant for repairs and improvements, and also with costs. Prentice *v.* Janssen, 79 *N. Y.* 478; aff'g 14 *Hun*, 548.

See, also, Ford *v.* Knapp, 102 *N. Y.* 135 (insurance and taxes); Bulen *v.* Burdell, 11 *Abb. Pr.* 381 (expense of protecting estate not allowed); Hitchcock *v.* Skinner, *Hoffm.* 21 (expense in defending common title); Cook *v.* Moore, 2 *So. Car.* 52 (subrogation to lien for compensation in favor of one advancing for expenses.

As to adjustment of rents between tenants in common see Scott *v.* Guernsey, 48 *N. Y.* 106; aff'g 60 *Barb.* 163; Bullwinker *v.* Ryker, 12 *Abb. Pr.* 311; Pickering *v.* Pickering (*N. H.* 1886), 2 *New Engl. Rep.* 246; S. C., 5 *Eastern Rep.* 209; Field *v.* Leiter (Ill. 1886), 4 *Western Rep.* 170; S. C., 6 *Northeastern Rep.* 877.]

*Allotment of share with improvements.*] And it appearing that Y. Z. is entitled to the present value of the building by him erected, as in his answer set forth, or to have the portion of the premises by him so improved set apart to him ; now, therefore, it is further ordered and adjudged that so much of said premises as are bounded and contained as follows : [description]   Being the same premises now occupied by said Y. Z., and upon which the buildings and improvements set forth and described in his answer herein were erected and put, be set apart to the defendant, Y. Z., upon his paying to the referee herein-after named the sum of          dollars, to be distributed and applied by said referee in like manner, with the proceeds of the other property and premises as hereinafter decreed and directed, and that all the parties hereto, plaintiff and defendants, unite in a conveyance to said Y. Z. of the same, and that thereupon the said Y. Z. be vested in his own right of the fee to the same, and thenceforth forever be barred of any and all claim against the estate of M. N., deceased, or the heirs of said M. N., because, by reason of, or for, or on account of the said buildings and improvements so as aforesaid by him made, and in his answer de-scribed and set forth.

[Allowance may be made for improvements. Ford *v.* Knapp, 102 *N. Y.* 135; Pickering *v.* Pickering (*N. H.* 1886), 2 *New England Rep.* 246; S. C., 5 *Eastern Rep.* 209; Field *v.* Lieter (*Ill.* 1886), 4 *Western Rep.* 170; S. C., 6 *Northeastern Rep.* 877; St. Felix *v.* Rankin, 3 *Edw.* 323; Conklin *v.* Conklin, 3 *Sandf. Ch.* 64; Town *v.* Needham, 3 *Paige,* 545; 1 *Story Eq.* §§ 655, 656, b.

A partition of a mill-pond and water-power may be made, and one part charged with a servitude for the benefit of the other.   The commis-sioners may divide the dam and lands under water, and make such pro-vision for keeping different portions of the dam, water-gates and flumes in repair, and regulations for use of water-power, as the parties might make in any partition deed between themselves.   Smith *v.* Smith, 10 *Paige,* 470.]

A judgment in partition setting off mills, one to each party, with water-rights and privileges belonging to them respectively, gives the right of keeping the respective dams as they then were.   Hills *v.* Dey, 14 *Wend.* 204.

Note on Special Clauses in Judgments for Partition.

As to direction that parties convey or release, see Gay v. Parpart, 106 *U. S.*, 679 ; S. C., 1 *Supm. Ct. Rep'r*, 456.]

*Disposition of sum paid for equality.*] That the aforesaid sum of , directed to be paid by said Y. Z. to the said referee, be by said referee added to and made to form a part of the proceeds of such sale in the first instance, and dealt with and applied in gross as a part thereof, in like manner as if said sum had been received upon an actual sale of a portion of said premises.

*Several interests, or proceeds to remain subject to lien.*] That the interests of each of the parties in said lands, or in the proceeds arising from the sale hereby directed, remain respectively subject to the provisions of the said judgment entered herein on the        day of        , 18  , and to the liens stated in said report of R. F., Esq., to have been found existing thereon, and of the present judgment, until the same are satisfied.

[Lien transferred to proceeds. Kilgour v. Crawford, 51 *Ill.* 241 ; Garvin v. Garvin, 1 *So. Car.* 55; Guardian Life Ins. Co. v. Farmer's, &c. Bank, 57 *Penn. St.* 388.]

*Direction to bring residue into court to await further directions.*] And it is further ordered, adjudged and decreed, that the residue of the proceeds of the sale of said premises which shall remain after the payment of the fees, charges, costs and disbursements as aforesaid, and the payment of all taxes and assessments except the assessments aforesaid, that shall be a lien or liens on said premises at the time of such sale, and the payment of the additional allowance as hereinbefore provided, be brought into this court by said referee and paid to the United States Trust Company, in the city of New York, to be retained by said Trust Company to the credit of this action, said residue to remain in the custody and possession of said Trust Company to the credit of this action, subject to the further order, judgment or decree of this court herein, upon the application of any of the parties hereto, who are owners of said premises, after due notice thereof to all the parties who have appeared in these proceedings, who are interested as owners of said residue, and to the said C. D., and E. F., judgment creditors, as aforesaid.

[Interest devised to husband in trust for wife for life, remainder to her heirs, subject to life estate in surviving husband. Fund must be brought into court See Noble v. Cromwell, 26 *Barb.* 475 ; S. C., 6 *Abb. Pr.* 59; aff'd in 3 *Abb. Ct. App. Dec.* 382 ; S. C., 27 *How. Pr.* 289.

Where the decree directs that the principal of a sum invested to pay interest during life, be, upon death, divided among other parties,

naming them, some of whom died, their shares are to be paid to their personal representatives. Robinson *v.* McGregor, 16 *Barb.* 531.]

*Direction to bring into court principal of which executor has life income to indemnify legatees unpaid.*] That one-eighth of the net purchase money arising upon the sale to be made of the said lands, after making the several payments stated in the foregoing clause of this judgment, be brought into court and paid by said referee to the chamberlain of the city and county of New York, to be invested by him and held subject to the directions in the seventh clause of this judgment, and the interest and income thereof, during the life of  · , to be paid over to the six surviving children of M. N., dec'd, namely, [*name,*] share and share alike, until the full amount of the indebtedness of the said plaintiff to the said children of M. N. hereinafter adjudged to be due to them, or whatever balance may be remaining unpaid, be fully paid: namely, the sum of   dollars with interest thereon from the said ·day of   , 18 ·, and after that indebtedness shall be paid, then said chamberlain continuing to hold an eighth of the proceeds of said sale during the life of said plaintiff as aforesaid, shall pay over the interest and income of each such share during such life respectively to the persons in this clause hereinafter designated until the sum of $   with interest as specified in said judgment, entered herein on the   day of   , 18 , or whatever balance may be remaining unpaid, shall be fully paid, namely.

That upon the decease of said plaintiff A. B., whether the payments directed in clause 6 of this judgment have been completed or not, one   of the said share, together with all arrearages of income thereon, be paid over by said chamberlain, share and share alike, to the defendants [*names,*] absolutely as in fee, but the directions in this clause (seventh) are subject to the contingencies stated in clause tenth hereof.

*Direction to bring proceeds into court to abide further litigation.*] That he bring the remainder of said one-third into court, according to law, there to abide the result of the litigation between and the determination of the claims of W. X. and Y. Z., defendants herein, who claim as against each other to be entitled to the same or some portion thereof; and that the question of allowances and of the costs after this date be reserved until the determination of the litigation between the defendants respecting their interests in said remaining one-third.

[Sustained in Fleming *v.* Burnham, 18 *Weekly Dig.* 559. See also Wiggins *v.* Howard, 83 *N. Y.*, 613; aff'g 22 *Hun*, 126; Phelps *v.* Green, 3 *Johns. Ch.* 302; Jordan *v.* Poillon, 23 *Weekly Dig.* 68.]

*Direction to reserve amount of lien of a person not a party.*] And

Note on Special Clauses in Judgments for Partition.

the said referee having reported that the life interest of the said U. V. in the said premises and in the proceeds thereof, is subject to a lien to the amount of , the nature of which is described in the said report, and it appearing that such lien is not in favor of any person who has appeared to claim this amount, it is hereby further ordered and adjudged, that all questions in reference thereto be, and the same hereby are, reserved for such application as is herein provided to be made at the foot of this judgment.

It is further ordered and adjudged, that any such person, and any other party in interest may make such application to this court as may be necessary upon such notice to all other parties in interest, as shall be according to the rules and practice of this court, or as shall by the court be prescribed.

*Direction to bring part of proceeds into court to await contest of assessment.*] That said referee place on deposit with the United States Trust Company, to the credit of this action, out of the proceeds of the sale hereinafter to be made herein, a sum sufficient to pay the following assessments, with all interest thereon, viz.: Assessments confirmed December 29, 1876, for regulating, grading and paving the Boulevard, and assessed on lots known as Ward Nos. 11, 54, 55, 56, and 57, and which assessments amount in the aggregate to , and in the event the court shall finally adjudge payment thereof, to pay the same, or if said assessments shall be vacated, to provide for the payment to said [*attorney*] of twenty-five per cent. of the benefit arising from the vacation thereof.

*Direction to bring proceeds into court pending life tenancy. After the usual direction as to gross sum*]. But if she shall refuse to accept a gross sum in lieu of her dower interest, then it is further adjudged, that the said referee, after paying the costs and disbursements, do bring one-third of the said one fifty-fourth $(\frac{1}{54})$ part of the net proceeds of sale of said premises, into court, and pay the same to the county treasurer of Kings county to be by him invested for·her benefit, and the interest or dividends to accrue thereon to be paid over to her during her natural life.

[When, in partition, a sale is had and provision made for satisfaction of inchoate right of dower, under·L. 1840 (3 R. S. 3 ed. 420, § 57), by paying into court a gross sum fixed by a master as its present value, such sum is the wife's personal property, and goes upon her death, to her husband. *V. Chan. Ct.*, 1846, Bartlett *v.* Van Zandt, 4 *Sandf. Ch.* 396. Otherwise, perhaps, if not actually paid in.]

*Direction to bring proceeds into court, pending life estate initiate or*

*inchoate.* *After usual direction as to gross sum.*] But if he shall refuse to accept a gross sum in lieu of initiate right of curtesy therein, then it is further adjudged that the said referee, after paying the costs and disbursements, do bring the gross sum so ascertained by him to be a reasonable compensation therefor, into court, and pay the same to the county treasurer of Kings county, to be by him invested so that the same may accumulate during the joint lives of the said plaintiffs J. L. B. and A. B., his wife, and, upon the death of either, application may be made to this court for the same, by any person or persons entitled thereto.

*Direction to referee to make and file map.*] That the said referee employ a surveyor and cause a map of the said lands, premises, and real estate to be made, showing the same subdivided into lots, gores, and parcels of such form and dimensions as he may deem most practicable with reference to the streets and avenues now existing upon the commissioners' plan of the City of          , which map shall be entitled by some sufficient designation to be devised by him, and shall be signed by him, as such referee, and filed in the office of the register of the county of          .

*Sale to be in separate parcels according to tenancy.*] That each of the said two parcels be sold separately, or that, if in the judgment of said referee it be found practicable, the parts or portions of each parcel now occupied by each of the said several tenants under their said leases, be sold separately, or in such portions as to the said referee may seem most for the interest of all the parties interested therein.

*Authority for special advertising.*] That said referee is hereby authorized to have maps of said premises made, printed and distributed, and to give such order and further notice of said sale beside that required by law as he may deem for the interests of the parties hereto, provided that the entire expenses incurred by the said referee under this permission shall not exceed          dollars.

*Direction as to successive distributions.*] That the referee be at liberty, in case of partial sale or sales of said premises, to make one or more separate distributions of the proceeds of sale, and also one or more separate reports of his proceedings in the premises from time to time, as circumstances may require.

*Direction for duplicate receipts thus bringing distribution into executors' accounts.*] Such payments by the referee shall be made only upon the delivery to him of duplicate receipts acknowledging the same to have been received from the trustees under the will, through the referee, pursuant hereto, and one of each such duplicates shall be deliv-

ered to the said executors and trustees, and the payment shall be entered in their accounts as, and be deemed to have been made by them as fully as if, made by them alone.

*Executors to reimburse themselves.*] That upon the account rendered by said report, said executors have overpaid to the defendant W. X. the sum of    , and it is adjudged that they are entitled to reimburse themselves therefor by withholding that amount from subsequent income accruing to him.

*To make up deficiency.*] That there remained due to U. V. from said executors upon said account during said period   the sum of which they are hereby ordered and adjudged to pay.

[On the last clause execution may issue (*N. Y. Code Civ. Pro.* §§ 1240, 1241); but the executors will not be punishable by proceedings for contempt unless it is also adjudged that they have the amount in hand.]

*Sale to be subject to taxes, assessments and leases.*] And that such sale and conveyance be made subject, nevertheless, to the taxes, assessments and leases aforesaid.

[Compare *N. Y. Code Civ. Pro.* § 1676. Direction as to paying taxes, &c. Weseman *v.* Wingrove, 85 *N. Y.* 353; aff'g 9 *Weekly Dig.* 434; Simms *v.* Voght, 11 *Abb. N. C.* 48.]

*Leave to take purchase money mortgages with special clauses.*] That a credit of not more than    years may, by the said referee, be given for not to exceed seventy per cent. of the purchase money of the said premises, to be secured at interest by one or more mortgages on the premises sold, and also by the bond or bonds of the purchaser conditioned for the payment of the sum secured in not more than    years from the date of said sale, with interest at not less than    per cent., and that such bonds and mortgages may contain such special clauses as to the said referee may seem most suitable and necessary for the protection of the interests of all concerned.

*Another form.*] That the referee, on request of the plaintiffs or their attorney, shall insert in the terms of sale a provision as to any of said premises, that 60 per cent, of the purchase money may, at the option of the purchaser, remain on bond and mortgage for a term and rate of interest to be specified according to the request of the plaintiffs, provided that at least enough of the purchase money be required to be paid in cash to equal the one-quarter of the net proceeds of the sale directed to be distributed by this judgment in addition to the costs and expenses herein provided for. And it is further adjudged that mortgages taken pursuant to this provision shall be transferable to the city cham-

berlain as cash in the performance of the direction in clause sixth of this judgment.

[People *v.* Globe Mut. Life Ins. Co., 65 *How. Pr.* 81 ; L. 1875, c. 542.]

*Direction as to possession; subject to leases.*] And it is further ordered, subject, however, to the direction hereinbefore given as to leases, that the purchaser or purchasers of said premises, or any part thereof, at such sale, be let into possession thereof.

*Direction as to title deeds where there are several parcels.*] And it is further ordered, that such title deeds as may be in the possession or under the control of any of the parties and as appear to relate solely to any parcel or parcels sold to one and the same purchaser, or any part thereof, be delivered up to any person or persons who may, on such sale, become the purchaser or joint purchasers of the premises to which the same solely relate.

---

*Application for further directions declaring proceeds of real property to be personal, or otherwise.*

If there was an express adjudication in the decree on this subject, erroneous as matter of law, the technically proper remedy to correct it, as between parties to the action having an adverse interest, would be by appeal, but if there were no directions, or if the only interest in the correction be that of the infants and those claiming under them, the correction may be made on motion. For this purpose either a petition or an affidavit, and the usual notice of motion on an order to show cause is proper; and, if application is on the part of a defendant, notice should be given to the plaintiff and to whatever defendant may by possibility have an adverse interest.

*Affidavit by representative of deceased infant to move to modify decree, so as to declare fund to be personalty and direct payment.*

[*Title of court and action.*]
    [*Venue.*]
    M. N., being duly sworn, says:
    I. That heretofore C, B., of        , died in the year 18   , leaving surviving her five children her only heirs at law, namely: the plaintiff and the three defendants above named, and leaving her last will and testament, whereby she left all her property to R. B. H., and J. B,, as her executors; subject to the trusts, conditions and powers therein set forth.
    II. That said executors, having duly qualified and entered upon the

Note on Special Clauses in Judgments for Partition.

discharge of their duties, thereafter commenced the above entitled action for the purpose of procuring a construction of the said will, and asking that the court would direct the said executors. to carry into execution a contract to sell a portion of the real estate of the said testatrix theretofore made by them in accordance with the conditions thereof, and also for the purpose of obtaining a partition and sale of the remainder of the real estate of the said testatrix not included by the said executors in the aforesaid contract.

III. That subsequently a decree was made in the said action, whereby it was, among other things, adjudged that the provisions of said will by which said executors were directed to sell and convey a certain portion of said real estate were valid, and the said executors were thereby directed to complete and execute the contract to sell and convey, made by them; and the remainder of said premises was duly directed to be sold by a referee appointed for that purpose, and that said executors and referee should dispose of the proceeds of the sale of said real estate, by paying the one-fifth thereof to the plaintiff above named, and depositing with the county treasurer of the county of Duchess, the remaining four-fifths thereof, for the benefit of the minor children of said testatrix to wit : [*names,*] subject to the further order of the court thereon, each of the said minors being entitled to the one-fourth part of the amount so deposited.

IV. That the said real estate has been sold by the said executors and referee and the proceeds thereof disposed of in the manner directed by the said decree; and that there is now in the hands of the said          , county treasurer, the sum of $     , held by him for the shares of the aforesaid four minor children in the proceeds of the real estate sold in the manner aforesaid; and that the share of [*name of deceased infant*] in said proceeds, is the one-fourth thereof, being the sum of $      .

V. That said [*name*] died in October, 1867, being then under the age of twenty-one years, leaving her last will and testament, whereby she gave to this deponent, who was her husband, all her estate of whatever nature, and appointed him sole executor of her said will, and that said will has been duly proved, by a decree of the surrogate of          county, duly made the   day of         , 18  , and letters testamentary thereon have been issued to deponent, who has qualified as the executor thereof, and is now such executor.

[*If any parties in interest are absentees or difficult to serve, state residences and addresses, so as to take direction of the court as to how they shall be served, unless they will appear by attorney.*

*If order to show cause is asked, state as to previous application.*

*Add certificate of treasurer to fund in hand.*]

*Order declaring proceeds to be personal property and directing pay-ment.*

[*Title of cause.*]

At a special term, etc.

On reading and filing, [*mention the affidavit and other papers on which the motion is made, and appearances, or proof of service of notice, etc. as usual.*]

ORDERED and adjudged, 1. That the judgment in this cause be and the same hereby is supplemented as follows: the share of the defend-ant [*name*] in the proceeds of the sale directed and had in this cause is hereby adjudged to be personal property.

2. That the treasurer of          county is hereby directed to pay to the attorney for          herein, out of said share the sum of          dollars, his costs of this motion.

3. That the residue of said share together with all accumulations of interest thereon be paid over by said treasurer to the petitioner [*name*].

-------

On this subject of the character of proceeds as real or personal, see Armstrong *v.* McKelvey, 104 *N. Y.* 179; Bartlett *v.* Van Zandt, 4 *Sandf. Ch.* 396; Sweezy *v.* Thayer, 1 *Duer,* 286; Horton *v.* McCoy, 47 *N. Y.* 21; Petition of Thomas, 1 *Hun,* 473; Foreman *v.* Marsh, 11 *N. Y.* 544; rev'g 7 *Barb.* 215; Matter of Finch, *Clark,* 538; Davison *v.* De Freest, 3 *Sandf. Ch.* 456.

An infant cannot be estopped from asserting title to real estate. Brumfield *v.* Boutall, 24 *Hun,* 451; Battell *v.* Burrill, 50 *N. Y.* 13. But the court in a proper case may exercise a consent or an election for the infant.