plaintiff's claim for rent. I think this is also warranted by the rulings in the Thomson-Houston Case cited above.

While defendant in his answer alleges that he has been damaged to the extent of $100, upon the trial no such damages were shown; but he testified that the fair rental value of the premises without heat and water was not over $2 per month, whereas, with heat and water furnished, they would have been worth $5 per month. Under the rule laid down in Beakes v. Holzman, 47 Misc. Rep. 384, 94 N. Y. Supp. 33, that measure of damages would be rulable. Plaintiff has not contradicted defendant's testimony, and it stands as the only evidence in the case upon the subject of damages. We thus have a situation of a defendant, who might probably have claimed an eviction and vacated the premises, still retaining possession of the premises and coming into court and conceding that, even in the condition in which the landlord has reduced them to, they are worth $2 per month, all of which amounts to an admission that he owes rent at $2 per month from and including December, to and including July, a total of eight months, amounting to $16.

[3] Defendant testified that he was "ready and willing" to pay any rent that might be due, but I do not think that will suffice. It was held in Jarvis v. Driggs, 69 N. Y. 143, that, if rent is due and unpaid and there is a holding over by the tenant without permission and demand, the landlord is entitled to a warrant of dispossession. See, also, Durant Land Improvement Co. v. East River Electric Light Co., 15 Daly, 337, 6 N. Y. Supp. 659, in which case it was held that, if any rent whatever is due, it must be paid if the tenant wishes to retain his lease, and that the tenant to be relieved of default must tender what is due; also that the landlord need not demand the exact sum.

I therefore reach the conclusion that the defendant is indebted to the plaintiff in the amount of $16 for the past eight months' rent; that due demand has been made therefor, and the same has not been paid or tendered; and that, therefore, the plaintiff is entitled to a warrant dispossessing the defendant, and to a judgment for costs to be taxed.

Judgment accordingly.

---

(73 Misc. Rep. 335.)

### In re YOUNGS et al.

(Surrogate's Court, New York County. August, 1911.)

DESCENT AND DISTRIBUTION (§ 38*)—REPRESENTATION AMONG COLLATERALS.
    Under Laws 1903, c. 367, and Laws 1905, c. 539, relating to distribution of estates, the aunt of an intestate will take to the exclusion of the children and grandchildren of deceased aunts and uncles.
    [Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 111–115; Dec. Dig. § 38.*]

In the matter of the settlement of the accounts of William H. W. Youngs and the Windsor Trust Company, administrators. Decree rendered.

Winthrop & Stimson (Egerton L. Winthrop, Jr., and Charles L. McVeigle, of counsel), for administrators.

Winthrop E. Dwight, for committee of Phebe Powelson.

Hedges, Ely & Frankel, for Sarah A. L. Vanderbilt and others.

FOWLER, S. This matter now comes before the surrogate on the settlement of a decree which provides for the distribution of intestate's personal property. The point submitted to the surrogate involves the construction of the statute of distributions of this state, as finally expressed in the decedent estate law.

George W. Adams died intestate in this county on the 20th day of November, 1909. The surplus of his personal property is now to be distributed.

The point presented to the surrogate for determination is whether or not on such distribution of the property of the intestate, who leaves no parents, no wife, no children, or descendants of children him surviving, an only aunt (in this instance ex parte materna) is entitled to distribution to the exclusion of the children and the grandchildren of deceased aunts and of deceased uncles of intestate. The aunt in question is, by any recognized method of computation, the nearest of kin in degree of propinquity to intestate, and, unless representation is permissible among the descendants of deceased uncles and of deceased aunts of intestate, the aunt will, in this instance, take all to the exclusion of such descendants. The points involved have been extremely well argued at the bar, and with such research and profundity that it would be ungracious, I think, in the surrogate not to notice some of the elaborate historical arguments of counsel which the surrogate deems himself bound to exclude in his conclusions. The property passing under the decree is large, and the interests affected by it are important, but above all in importance is the question itself. It demanded the careful consideration which it certainly has received at the hands of counsel.

It is, of course, entirely familiar learning that the English statute of distributions in 1774 became, by express re-enactment, a part of the law of this state, as it was probably before such re-enactment. It was only revised by the revisers of the Revised Statutes of 1829, without substantial change. Revisers' note to 2 R. S. 96, § 75. Chapter 686 of the Laws of 1893 next transferred without material change the statute of distributions as contained in the Revised Statutes (2 R. S. 96, § 75) to section 2732 of the Code of Civil Procedure. If we disregard a temporary alteration of the year 1898 (chapter 319), soon removed, in effect, from the statute book (Laws of 1905, c. 539), the statute of distributions, as re-enacted in the Code of Civil Procedure by chapter 686 of the Laws of 1893, remained substantially as displayed in the Revised Statutes, at least until the year 1903, when chapter 367 of the Laws of 1903 varied the language of subdivision 5 of section 75, 2 R. S. 96. Chapter 539, Laws 1905, in like manner, somewhat varied the language of subdivision 11 of section 75, 2 R. S. 97. In other respects the statute of distributions, as first en-

acted, temp. Charles II, remains in substance on the present statute book of this state.

The proposition now argued for the remoter kindred of the intestate in this cause is that the variations of language so made by the acts of 1903 (chapter 367) and of 1905 (chapter 539) introduced an entirely new rule in the statute of distributions, viz., one extending representation and partibility among collaterals of every degree. This claim is large and counter to the principle hitherto underlying the statute, and any other of its amendments except the temporary one of 1898. If I understand the elaborate and learned argument of counsel for Sarah A. L. Vanderbilt and other persons who are the children and grandchildren of deceased aunts or uncles of the intestate, it is contended in their behalf that the statute of distributions in force in this state until 1903 was in reality a re-enactment of the English statute of distributions (22, 23, Car. II, c. 10, amended 1 Jac. II, c. 171); that the English statute was derived from the 118th Novel of Justinian, and that the Legislature of this state, fully recognizing this established fact, intended by the passage of chapter 367, Laws 1903, and chapter 539, Laws 1905, to change the principle on which the Justinianian law scheme and the statute of distributions were originally framed, and to substitute therefor a principle which is more consistent with the present institutions of this state and with a wider diffusion of property among next of kin of remoter degrees of propinquity to the intestate. If this argument, so elaborately constructed and fortified by reference to Latin writers of authority and distinction, were, indeed, founded on conceded facts, there would be a practical difficulty in following it to its logical conclusion. The English statute of distributions, now substantially our own statute, is comparatively ancient, and it has become imbedded in a mass of well-considered construction which deprives its adventitious origin of any practical significance. Statutes of this state, in force for upwards of 200 years, ought not, I think, to be construed on the basis of assumptions concerning their remote origin and intention, and their consequent unfitness for continuation.

The surrogate would not dare to venture to construe an ancient statute of this state on any subtlety not precisely sanctioned by authority. That cardinal maxim of the fundamental law of this state, "stare decisis, et non quieta movere," would prevent such audacity. It has always been the rule that any judicial officer of this state, even the most exalted, must abide by established authority, and not substitute his own conceptions therefor. Manning v. Manning, 1 Johns. Ch. 527, 530. This rule, so plainly announced by Chancellor Kent, is especially applicable to such inferior courts as those of the surrogates, possessed of a limited or special jurisdiction. Within bounds, principles of testamentary law, when taken literally and bodily from Roman or other ancient sources, may doubtless receive illustration by reference to the original source and even to recognized commentaries on the original text itself. This course has the sanction of high authority. Farther than that the ecclesiastical courts of England, or the probate courts of this state, have never felt authorized to go. When

the consideration of such courts is directed to statute law, they must look wholly to the text of the statute and to decisions on its text. The surrogate knows of no ancient statute of England or of this country (and the same "Statute of Distributions" is in substance in force in both countries) which has been construed on such remote analogies or principles as those suggested in this cause by the counsel for the more distant kindred of intestate. While such arguments are no doubt very proper for counsel, seeking in every legitimate way to illuminate paths of difficulty, and it is pleasant to see them, they would, I think, ill become a modern court of justice to adopt.

Positive law is eminently a practical science, one intended to regulate and resolve the affairs and the interests of the living. Its consistent application, according to established usage, is most important. In the construction of statutes it would seem to be unwise to reach for novelties or to attempt to pursue recondite historical theories to their logical conclusion, if such theories contravene the approved experience of centuries. Profound historical inquiries, doubtless, have their proper use in law as elsewhere, but at this time of day they are seldom determinative of practical legal conclusions, although at rare intervals they may be of great service in ascertaining the vis virida of a principle which has animated or inspired the development of legal doctrine and the just application of such doctrine to the affairs of those who are obliged to come into courts of justice for the solution of their difficulties or for practical assistance. Certainly the construction of amendments to an ancient statute, such as the "Statute of Distributions," settled in the reign of Charles II and James II, the surrogate cannot, I think, with sobriety, be expected to make on any theory elaborated from the ascribed motives for the legislation of Justinian.

But for the satisfaction of counsel we may stop awhile to examine the validity of the assumptions involved in their historical contention. There is no doubt recognized judicial authority for their claim that the original "Statute of Distributions" was founded on the 118th Novel of Justinian (Matter of Suckley, 11 Hun, 344; Adee v. Campbell, 14 Hun, 551), although the Court of Appeals in affirming the judgment in the latter case (79 N. Y. 52) made no reference whatever to the historical allusions below. In Matter of Davenport the court simply refers generally to the Justinianian legislation. 172 N. Y. 460, 65 N. E. 275. For a long time material differences in principle have, however, been noticed in the course of critical comparison of the statute of distributions with the 114th and 127th Novels of Justinian. 4 Burns' Ecc. Law, 555.

Whenever courts of justice enter on the field of the historian, it is for the purpose of enabling them to take judicial notice of facts, and in such cases the parties are always at liberty to prove the facts to be otherwise. There is no such thing as an adjudication of a historical problem by a court of justice. While the statement that the English statute of distributions was taken from the 118th Novel of Justinian was adopted by no less a personage than the great commentator on American law (2 Kent, Com. 422), the statement itself was not origi-

nal with him.  See Ld. Raym. 573.  That Kent did not stop to inves-
tigate with his usual profundity a matter so collateral to the real pur-
poses of his Commentaries is perhaps evident.  Blackstone, on the
other hand, in his equally famous Commentaries on the Laws of Eng-
land, is much more guarded in his statement on this subject than is
Kent.  2 Black. Comm. 516.  Blackstone does not profess to fix the
origin of the statute of distributions.  That Kent's statement was
most general is evident from the fact that he made no reference what-
ever to the 127th Novel of Justinian, although it was an important
part of the Justinianian scheme for the distribution of the property of
intestates, and, indeed, in reference to the cause before the surrogate
Novella CXXVII "De fratrum filiis," cap. I, would be the most im-
portant if the Justinianian legislation had in fact any real or precise re-
lationship to the origin or construction of the old statute of distribu-
tions still, in substance, in force in this state.  See Revisers' Note to 2
R. S. 96, § 75.  That the statute of distributions was founded on the
Justinianian scheme modern historical scholars have at last come to
doubt.  That statute probably finds its logical and immediate origin
in the sequence of ancient customs of English-speaking peoples, as
those customs were established in the reign of Charles II; but more
particularly in the ancient practice of the ecclesiastical courts in grant-
ing letters of administration.  Palmer v. Allicock, 3 Mod. 61; 2 Wil-
liams' Adm'rs & Ex'rs (Ed. of 1838) 1060.  Precisely what law con-
trolled this practice is uncertain.  The ecclesiastics, though canonists
and civilians, were eminently practical men, and they were, above all,
Englishmen.  Whether or not the customs and practice of the eccle-
siastical courts in England do not in some respects go back in turn to
a time anterior to even the legislation of Justinian is one of the in-
teresting problems of modern historical scholarship, as yet, I believe
in this instance, unsolved.  But I do not regard these things as of real
importance in the solution of this matter.  My only object in refer-
ring to them at all is to disclose to counsel that the surrogate has not
left out of serious consideration the real force of their contention.

It is not to such things as the theory of the Justinianian legislation,
but to the final decisions of the courts of justice on the text of the
statute of distributions that the surrogate must look for light and
guidance when he comes to consider the effect of the recent amend-
ments.  These decisions disclose fundamentally that from the earliest
times in the distribution of the property called in our law "personal"
(as contradistinguished from the partition of the property called by
common lawyers "real property") representation was not to be admit-
ted among remote collaterals of intestates.

This basic rule is found, of course, in the text of the statute of dis-
tributions (Car. II, c. 10, §§ 7, 22, 23; Laws N. Y. 1774, c. 11 [5 Col.
N. Y. Laws, p. 614, c. 1649]; Laws 1787, c. 38; 2 J. & V. 71; 1 K.
& R. 535, § 15; 1 R. L. of 1813, p. 313, § 16; 2 R. S. 97, § 75, subd.
11; Laws 1893, c. 686, enacting Code Civ. Pro., § 2732, subd. 12),
but it received its most precise application from the construction soon
given by the courts to the text of the statute.  Not long after the first
enactment of the statute of distributions in 1683, the question arose

whether the words of the statute providing "that there be no representation among collaterals after brothers' and sisters' children" were to be intended of brothers and sisters of intestate only, or of another beside intestate, and the court held that representation should be confined to the brothers and sisters of intestate, that the intestate was the subject of the act, and that it was his brothers and sisters only who were intended. Maw v. Harding, 2 Vern. 233. The principle of this case was soon afterward applied in Pett v. Pett, 1 P. Wms. 25; 1 Salk. 250. Since then it has never been doubted that among collaterals representation is confined by the Statute of Distributions to the intestate's immediate fraternal kindred. Doughty v. Stillwell, 1 Bradf. Sur. 300, 302; Matter of Suckley, 11 Hun, 244; Adee v. Campbell, 79 N. Y. 52. I use the words "fraternal kindred" in this connection advisedly, instead of "brothers and sisters," because of the recent amendments.

If the principle of succession by representation among all collaterals were engrafted on the statute of distributions by the acts of 1903 and 1905, it would (as noticed in Matter of Davenport, 172 N. Y. 454, 457, 65 N. E. 275) lead to very minute subdivisions among very remote kindred of intestate. If representation is not admitted among remote collaterals from intestate, but the succession is confined to a stirps or stock, the propositus of which is that most proximate to intestate, problems of distribution are much simplified. It is obvious to my mind that the amendments of 1903 and 1905 to the New York statute do not in any event extend the principle of representation to this case now before me, and that is the sole question here. What the intention and effect of those amendments of 1903 and 1905 in other respects were is not involved in this matter, and any expression of opinion on that point would be gratuitous and inexpedient, as it is not involved here and it has not been argued in this matter. My conclusion is that the aunt of intestate, under the statute in force, is as next of kin to intestate solely entitled to distribution of this intestate's property to the exclusion of the other kindred claiming the same adversely to her.

I am very happy to observe that my conclusion is consistent with decisions rendered in the co-ordinate jurisdictions of this state by gentlemen of more experience and wisdom. Matter of Nichols, 60 Misc. Rep. 299, 113 N. Y. Supp. 277; Matter of Barry, 62 Misc. Rep. 456, 116 N. Y. Supp. 798; Matter of Schlosser, 63 Misc. Rep. 166, 116 N. Y. Supp. 796; Estate of Lohman, Surr. Decs. 1908, p. 237.

Let the decree be settled providing for an exclusive distribution of the surplus of the intestate's personal property to Phebe Powelson, the sole surviving aunt of intestate and his nearest of kin him surviving.

Decreed accordingly.