IN THE MATTER OF THE ESTATE OF HYMAN SAPERY, DECEASED.

Argued December 1, 1958—Decided January 19, 1959.

600

*Mr. Saul J. Zucker* argued the cause for the appellant caveator, Stanley Sapery (*Messrs. Kristeller, Zucker, Lowenstein & Cohen,* attorneys).

*Mr. Samuel Rosenblalt* argued the cause for the respondent, Maurice Cohen (*Mr. Nicholas H. Hagoort, Jr.,* of counsel).

The opinion of the court was delivered by

HEHER, J. At issue here is the testamentary efficacy of an instrument purporting to be a codocil, duly executed according to law, which appoints an executor of the maker's last will and testament theretofore made and revokes the nomination of the executor therein named, and modifies and amends the will accordingly but otherwise "confirm[s], rati[fies], redeclare[s] and republish[es]" the prior testamentary disposition. The stated question, *res nova* in New Jersey, is whether the codicil is "entitled to probate and the named Executor entitled to qualify, in the absence of the production of the Will itself," on the hypothesis that the operation of the codicil is "necessarily dependent" upon the subsistence and probate of the will itself.

The maker of the codicil died September 22, 1957, domiciled in Montclair, Essex County, New Jersey. The heirs at law and next of kin of the deceased comprise Stanley Sapery, nephew and nearest of kin, and certain great-nephews and great-nieces.

On October 4, 1957 Dr. Maurice Cohen, designated as executor in the codicil, a cousin of the deceased, interposed a *caveat* in the Essex County Surrogate's Court against the issuance of letters of administration or letters testamentary upon the estate of the deceased, inasmuch "as said decedent left a Codicil to a Will on which the [caveator] is named as Executor," and the will has "not as yet been located"; and on October 16 ensuing the deceased's nephew, Stanley Sapery, filed a *caveat* against the admission to probate of any paper writing purporting to be the will of the deceased, accompanied by a complaint for administration affirming that the deceased died intestate and praying that letters of administration be issued to him. There were counter-motions to dismiss the *caveats*: Stanley Sapery moved to strike Dr. Cohen's *caveat* on the ground that "no will [of the deceased] has been found," and he, the movant, had first right to administer the estate; Dr. Cohen moved to strike the Sapery *caveat* to the end that the "validly executed" codicil be admitted to probate. This stipulation

was made at a pretrial conference: "No Last Will and Testament of decedent has been uncovered and none was known to be in existence at the time of his death."

There was judgment admitting the codicil to probate and directing the issuance of letters testamentary to Dr. Cohen "as executor of [the deceased's] estate"; and the case is here by our certification, *sua sponte,* of Stanley Sapery's pending appeal to the Appellate Division of the Superior Court.

The argument has two facets: (a) a testamentary instrument which "does not dispose of property," but "merely appoints an executor" is not entitled to probate; and (b) a codicil "which depends upon a prior executed Will for its effectiveness" cannot be probated "if the Will itself is not produced."

But there is no reason in principle, either at the common law or by statute, why a "testamentary instrument" which "does not dispose of property," but merely nominates an "executor," should not be admitted to probate for the fulfillment of the maker's testamentary design. It is essentially a matter of intention; and it is fundamental in the social compact that one may make such provision as he choses for the distribution of his property after death, provided it is not contrary to positive law or public policy. The English statute of distributions, long recognized by historical · scholars as founded on the 118th Novel of Justinian, is now thought to have had its "logical and immediate origin in the sequence of ancient customs of English-speaking peoples, as those customs were established in the reign of Charles II; but more particularly in the ancient practice of the ecclesiastical courts in granting letters of administration," *Palmer v. Allicock,* 3 *Mod.* 58, 87 *Eng. Rep.* 37 (1684), 2 *Williams' Adm'rs & Ex'rs* (1838 *ed.*) 1060, customs and practice, it is suggested, that "in some respects [may] go back * * * to a time anterior to even the legislation of Justinian." *In re Youngs,* 73 *Misc.* 335, 132 *N. Y. S.* 689 (*Surr. Ct.* 1911).

Regulating succession or inheritance *ab intestato* is a legislative province. The Legislature has plenary power over the devolution of the title and the distribution of the intestate's property; and yet, presumably, the rules of descent and distribution are in accord with the intestate's intention, for the statutory intestate disposition may be defeated by the will of the owner of the property, if he possesses testamentary capacity; intestacy signifies the adoption of the legislative disposition, a conclusive presumption, although necessarily fictional in some cases: *e. g.*, the making of a will that cannot be probated for defect of execution as laid down in the statute; or the invalidity or unenforceability of provisions intended to dispose of the property. *In re Holibaugh's Will*, 18 *N. J.* 229 (1955). And compare *McCormick v. Hall*, 337 *Ill.* 232, 168 *N. E.* 900, 66 *A. L. R.* 1062 (*Sup. Ct.* 1929). See *Van Tilburgh v. Hollinshead*, 14 *N. J. Eq.* 32 (*Ch.* 1861); *Quick's Executor v. Quick*, 21 *N. J. Eq.* 13 (*Ch.* 1870); *Kennedy v. Kennedy*, 29 *N. J. L.* 185 (*Sup. Ct.* 1861); *Swetland v. Swetland*, 100 *N. J. Eq.* 196 (*Ch.* 1926), affirmed in part 102 *N. J. Eq.* 294 (*E. & A.* 1928).

Blackstone said, of the origin of testaments and administrations, that when property came to be vested in individuals by the right of occupancy, it became necessary for the peace of society that this occupancy should be continued, not only in the present possessor, but in those persons to whom he should think proper to transfer it, and thus came the introduction of the doctrine and practice of alienations, gifts, and contracts, "precautions [that] would be very short and imperfect, if they were confined to the life only of the occupier; for then upon his death all his goods would again become common, and create an infinite variety of strife and confusion," and so the "law of very many societies has therefore given to the proprietor a right of continuing his property after his death, in such persons as he shall name; and, in defect of such appointment or nomination, or where no nomination is permitted, the law of every society has directed the goods to be vested in certain particular indi-

viduals, exclusive of all other persons"; the former method of acquiring personal property, according to the express directions of the deceased, is called in England a testament; the latter, which is "also according to the will of the deceased, not expressed, indeed, but presumed by the law," is called an administration, "being the same which the civil lawyers term a succession *ab intestato* (from an intestate), and which answers to the descent or inheritance of real estates"; and "this power of bequeathing is coeval with the first rudiments of the law: for we have no traces or memorials of any time when it did not exist"; yet the power of bequeathing did not extend originally to *all* a man's personal estate; by the common law as it stood in the reign of Henry II, a man's goods were to be divided into three equal parts, of which one went to his heirs or lineal descendants, another to his wife, and the third was at his own disposal; or if he died without a wife, he might then dispose of one moiety, and the other went to his children; and so, *e converso,* if he had no children, the wife was entitled to one moiety, and he might bequeath the other; but, if he died without either wife or issue, the whole was at his own disposal; the shares of the wife and children were called their "reasonable parts": and this continued to be the law of the land at the time of Magna Carta, "which provides that the king's debts shall first of all be levied, and then the residue of the goods shall go to the executor to perform the will of the deceased: and, if nothing be owing to the crown," the chattels shall be resigned to the will of the deceased, reserving to his wife and children "their reasonable shares," later on modified to permit the deceased by will to bequeath the whole of his goods and chattels. *Blackstone's Com., Bk.* II, *pp.* 489–493.

▰ Characterizing testaments as of very high antiquity, *Blackstone, ibid., p.* 499, defines a last will and testament, in the terms of the old Roman lawyers, as "the legal declaration of a man's intentions, which he wills to be performed after his death." And he notes that both Justinian and Sir Edward Coke agreed that testaments are so called because

they are *testatio mentis,* a testifying of the mind. Swinburne defines "testament" as "a just Sentence of our Will, touching that we would have done after our Death." And he observes that "[s]ome there be, who do censure this excellent Definition to be defective, though unworthily; * * *"; " 'Tis by others defined to be an Appointment of an Executor or testamentary Heir, made according to the Formalities prescribed by Law," the definition in the civil law. *Swinburne's Treatise of Testaments and Last Wills* (*7th ed.,* 1793) *Part* I, § II [*p.* 3]; *Domat, liv.* 1, *tit.* 1, *s.* 1.

In principle, a nondispositive instrument which nominates an executor to administer the maker's estate is good and sufficient as a last will and testament if executed with all the testamentary formality ordained by the law. This constitutes the *animus testandi* requisite to a provable testamentary declaration. The term " 'will' * * * includes every species of testamentary act, which takes its effect from the mind of the testator, requiring a sound and disposing mind and capacity, and manifested by the proper execution of an instrument in writing, and thus includes any testamentary writing which operates by way of revocation, and not by way of cancellation; * * *." *Bayley v. Bailey,* 5 *Cush.* 245, 59 *Mass.* 245 (*Sup. Jud. Ct.* 1849). A codicil is a "will" within the "common understanding of the term." *Smith v. McChesney,* 15 *N. J. Eq.* 359 (*Prerog.* 1862). " 'Will' means the last will and testament of the testator and includes any codicil." *N. J. S.* 3A:1-1. "A codicil, duly attested, is a will." *Newhall v. Newhall,* 280 *Ill.* 199, 117 *N. E.* 476 (*Sup. Ct.* 1917); *In re Emmons' Will,* 110 *App. Div.* 701, 96 *N. Y. S.* 506 (*Sup. Ct.* 1906). See Judge Clapp's *Wills and Administration,* 5 *N. J. Practice,* §§ 23, 66.

A specific disposition is not essential to the *animus testandi* which is of the essence of an effective testamentary act, certainly not where administration is provided for by the nomination of an executor. The executorial appointment is enough. "From the old rule of the common law, which vested in an executor all the personal property,

charged only with a trust to pay debts and legacies, it logically followed that the mere appointment of an executor effectually disposed of all the personal property"; and the "modification of the rule by modern statutes simply imposes upon the executor the additional trust of distributing the residue among the next of kin, instead of keeping it for himself." *Mulholland v. Gillan,* 25 *R. I.* 87, 54 *A.* 928 (*Sup. Ct.* 1903). It may "often occur that, subject to the payment of his just debts, a testator is quite willing that his property shall be succeeded to as provided by law, while the selection of the minister through whom the settlement is to be made and the distribution is to be had is not only a matter of deep interest to him, but of vital interest to the estate; and, as the law accords to him the privilege of making the selection of his executor, it must be upheld, when duly made." *In re Hickman's Estate,* 101 *Cal.* 609, 36 *P.* 118 (*Sup. Ct.* 1894). See also *Barber v. Barber,* 17 *Hun, N. Y.,* 72 (*Sup. Ct.* 1879); *In re Vasgaard's Estate,* 62 *S. D.* 421, 253 *N. W.* 453 (*Sup. Ct.* 1934); *Sumner v. Crane,* 155 *Mass.* 483, 29 *N. E.* 1151, 15 *L. R. A.* 447 (*Sup. Jud. Ct.* 1892); *Morey v. Sohier,* 63 *N. H.* 507, 3 *A.* 636 (*Sup. Ct.* 1885). And compare *Reeves v. Duke,* 192 *Okl.* 519, 137 *P. 2d* 897, 147 *A. L. R.* 634 (*Sup. Ct.* 1943); *In re Seymour's Will,* 184 *N. C.* 418, 114 *S. E.* 626 (*Sup. Ct.* 1922); *Jolliffe v. Fanning,* 44 *S. C. L.* 186, 10 *Rich.* 186 (*Ct. App.* 1856); *Re Jordan, L. R.* 1 *Prob. & Div.* 555 (1868). Such an instrument is not inoperative as a will because "it disposes of the entire estate precisely as the law would distribute it, and the heirs-at-law, in such case, take by ,descent, and not by purchase, that is, under the will." *Lucas v. Parsons,* 24 *Ga.* 640 (*Sup. Ct.* 1858); *Bayley v. Bailey, supra.*

█ And where the purported disposition of property is ineffective, a duly attested will is good in respect of the appointment of an executor to administer the testator's estate: *e. g.,* the sole beneficiary's prior death; the invalidity or unenforceability of the provisions designed to dispose of any property, or the absence of any property to

be disposed of. *In re John's Will,* 30 *Or.* 494, 47 *P.* 341, 50 *P.* 226, 36 *L. R. A.* 242 (*Sup. Ct.* 1896); *In re Davis' Will,* 182 *N. Y.* 468, 75 *N. E.* 530 (*Ct. App.* 1905); *In re Hickman's Estate, supra; In re Mahaffay's Estate,* 72 *Mont.* 579, 234 *P.* 838 (*Sup. Ct.* 1925); *In re Murray's Will,* 141 *N. C.* 588, 54 *S. E.* 435 (*Sup. Ct.* 1906). See Annotation, 147 *A. L. R.* 642, 643.

▇▇ And, by the same reasoning, a duly attested codicil is entitled to probate, even though it does no more than nominate an executor of the testator's estate. See *In re Emmons' Will, supra.*

▇▇ One definition of an executor is "that he is one to whom a testator has given his goods, chattels, and personal estate, for the purpose of paying all his debts; * * *." *Farr v. Newman,* 4 *T. R.* 621, 100 *Eng. Rep.* 1209, 2 *Eng. Rul. Cas.* 135 (1792). The purpose of administration is to collect and protect the assets and pay the debts, funeral expenses, and all obligations falling upon the estate, and then to make proper distribution among those entitled to the residue, under the will or by law, as the case may be; and to this end the title to the personal property in possession or right of action vests in such personal representative in trust. *Neilson v. Russell,* 76 *N. J. L.* 655 (*E. & A.* 1908); *Hayes v. Hayes' Ex'x,* 45 *N. J. Eq.* 461 (*Ch.* 1889), affirmed 47 *N. J. Eq.* 567 (*E. & A.* 1890); *Giannetti v. Smith,* 66 *N. J. L.* 374 (*Sup. Ct.* 1901), affirmed 67 *N. J. L.* 687 (*E. & A.* 1902). In this regard, the powers and duties of an executor and administrator are much the same. See Judge Clapp's treatise, *ibid.,* § 527, and the cases there cited.

▇▇ It is a corollary of these considerations that if the will which the particular codicil supplemented was destroyed by the testator *animo revocandi, N. J. S.* 3A:3-3, then the codicil stands as an appointment of the executor therein named to settle the estate of the deceased testator according to law, just as if the will at the outset nominated an executor, without more. The question is essentially one of intention; and yet the revocation of a duly executed will and testament can be had only in the mode and manner

ordained by the statute. *In re D'Agostino's Will,* 9 *N. J. Super.* 230 (*App. Div.* 1950), affirming 6 *N. J. Super.* 549 (*Ch. Div.* 1949). Where, as here, the codicil nominating an executor is continued in existence notwithstanding the destruction of the will itself, it remains effective as testamentary provision for executorial administration of the testator's estate according to law in the case of intestacy, and is admissible to probate as such. It would seem to be axiomatic, barring an effective manifested purpose *contra,* that to the extent that a codicil may stand independently of the will, the revocation of the will would not include the codicil.

On the record made, the will and the codicil remained in the possession of the testator in life; the will cannot be found, and thus there is an unrebutted presumption that the testator destroyed the will *animo revocandi* but intended to continue the codicil in existence as a testamentary appointment of an executor to administer his estate, and the codicil is provable as such. The. course thus taken is "a testifying of the mind," signifying the mental action requisite to such testamentary declaration.

And it goes without saying that the presumption of the destruction of the will is not conclusive and if the will should be found, the action now taken will not preclude its probate as an unrevoked testamentary act, if such be the case.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.