NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0165-17T3

IN THE MATTER OF THE
ESTATE OF DOUGLAS
CASTELLANO and the
PARENTAGE OF
GREGORY BOCK.

_____

APPROVED FOR PUBLICATION

November 7, 2018

APPELLATE DIVISION

Submitted October 16, 2018 – Decided  November 7, 2018

Before Judges Fisher, Hoffman and Suter.

On appeal from Superior Court of New Jersey, Chancery Division, Essex County, Docket No. CP-0212-2016.

Darling Law Firm, attorneys for appellants Anne L. Murdock and Robert Castellano (Heather J. Darling, on the brief).

Law Office of Alice Beirne, attorneys for respondent Gregory Bock (Alice Beirne, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal we consider and reject an argument that the only child of an intestate decedent may be deprived of an inheritance through application of an "equitable adoption" theory derived from the fact that the child was born after his mother married a man other than the child's father.

As our description of the issue suggests, the circumstances are a bit convoluted. Elisa Marie Machiaverna ended a two-year relationship with Douglas Castellano and married Gregory Allen Bock two months later in March 1977. Elisa gave birth to a child seven months later. That child was named Gregory Allen Bock, Jr., and his birth certificate declared that Gregory, Sr. was his father, even though Gregory, Sr. knew he did not father the child, and even though Castellano knew that he did father the child.

Gregory, Sr. and Elisa separated less than three years later and were divorced by a judgment entered in 1983. Gregory, Sr. remarried, and he and his second wife had two children. He died in 1995.

Elisa never remarried, and she alone raised Gregory, Jr.[1] She didn't reveal to Gregory, Jr. that Castellano was his natural parent until 2008, when Gregory, Jr. was thirty years old. Gregory, Jr. knew Castellano because his mother and Castellano rekindled their relationship shortly after her divorce from Gregory, Sr.; but their renewed romantic relationship ended soon after it began.

---

[1] Elisa testified at her deposition – and it has not been disputed – that after the divorce Gregory, Sr. only saw Gregory, Jr. for brief visits approximately twice per year.

A-0165-17T3

Years later, when Elisa finally revealed that Castellano was his father, Gregory, Jr. learned the truth of Faulkner's aphorism that "the past is never dead; it's not even past."[2] He was stunned by this news; although resistant, he eventually commenced a casual relationship with Castellano that consisted of only occasional telephone calls and even fewer visits. It is fair to assume – particularly when viewing the facts in the light most favorable to Gregory, Jr.'s opponents[3] – that a true or psychological parental relationship never came into being. Gregory, Jr. was by then a young adult, pursuing an acting career, and living in New York City, well beyond the sphere of influence of any of these adults; at his deposition, he explained how the strangeness of the circumstances, his devotion to his budding acting career, and Castellano's own peculiarities stood in the way of the formation of more than a casual relationship with Castellano.

And then Castellano suddenly died. When he was murdered in 2016, Castellano was not survived by a spouse or other children. He also died without a will. A blood sample established what Elisa told Gregory, Jr. eight years earlier: Castellano fathered Gregory, Jr.

---

[2] WILLIAM FAULKNER, REQUIEM FOR A NUN 73 (Random House 1951).

[3] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

When Castellano's siblings – Anne L. Murdock and Robert Castellano – sought letters of administration, Gregory, Jr. filed a caveat and this lawsuit was soon commenced. It ended with a summary judgment that declared Gregory, Jr. was Castellano's sole descendant and alone entitled to inherit by the laws of intestacy. In appealing, Castellano's siblings argue that the judge should have permitted additional discovery, which they deem crucial to the issues. They also contend that the judge failed to give sufficient weight to N.J.S.A. 9:17-43(a)(1), which declares that "[a] man is presumed to be the biological father of a child if . . . [h]e and the child's biological mother are or have been married to each other and the child is born during the marriage . . . ." We find no merit in these contentions and affirm.

Because the matter was adjudicated at the summary judgment stage, the chancery judge was required to search the moving and opposing papers and ascertain whether any disputed material fact stood in the way of Gregory, Jr.'s claim to judgment. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016). At that stage – when raised – a judge must consider whether discovery is incomplete, Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 193 (1988); the opponent must demonstrate the likelihood that unanswered discovery requests will provide information necessary to establish elements of

the cause of action or a defense, Laidlow v. Hariton Mach. Co., Inc., 170 N.J. 602, 619 (2002); Bilotti v. Accurate Forming Corp., 39 N.J. 184, 206 (1963); Auster v. Kinoian, 153 N.J. Super. 52, 56 (App. Div. 1977). Appellate courts apply these same principles. Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

From Gregory, Jr.'s viewpoint, the case is simple. How title to a decedent's property passes is a legislative matter. In re Sapery, 28 N.J. 599, 604-05 (1959). Because Castellano died without a will, our intestacy laws governed the disposition of his estate. N.J.S.A. 3B:5-2(a). Those laws provide that when a decedent dies without a surviving spouse or domestic partner, the estate passes to "the decedent's descendants by representation." N.J.S.A. 3B:5-4(a). Consequently, Gregory, Jr. argues that, as he was Castellano's only surviving child, he alone is entitled to the estate. Stated another way, because Castellano died unmarried and because both his parents predeceased him, Castellano's siblings could only inherit if Castellano also died without children. N.J.S.A. 3B:5-4(c). So viewed, the only question was whether Gregory, Jr. was Castellano's descendant. A DNA test removed all doubt by conclusively establishing, as Castellano's siblings concede, that Castellano fathered Gregory, Jr.

A-0165-17T3

That would end the matter but for Castellano's siblings' novel argument that seeks to meld the statutory presumption of parentage arising from Gregory, Jr.'s birth while his mother was married to someone other than his natural father, N.J.S.A. 9:17-43(a), with: a "strong public policy" favoring family preservation "when neither the mother nor her husband have in any way disavowed the husband's paternity of the child," M.F. v. N.H., 252 N.J. Super. 420, 425 (App. Div. 1991); representations about George, Jr.'s parentage in his mother's divorce judgment[4]; and equitable adoption principles, which generally allow for the recognition of an adoption even when lacking a judicial imprimatur, Burdick v. Grimshaw, 113 N.J. Eq. 591, 595 (Ch. 1933). The siblings also argue that the chancery judge acted prematurely in granting summary judgment because they believe he should first have had "the full picture . . . to pass upon the nature of [Gregory, Jr.'s] relationships, not only with decedent, but with [Gregory, Sr.]." They claim summary judgment was premature because "[e]vidence might have been educed that [Gregory, Jr.] represented the identity of his father to other

_____

[4] The 1983 divorce judgment awarded custody "of the minor child of the marriage" to Elisa and granted Gregory, Sr. visitation; Gregory, Sr. was also ordered to pay $80 per week in support, although the judgment does not identify whether this amount represented alimony, or child support, or both.

6

entities and agencies, as well, perhaps collecting survivor's benefits after [Gregory, Sr.'s] death, perhaps implicating student loans."

The siblings' argument pits the statute that a child born of a mother in wedlock is presumed to also be the child of her husband, N.J.S.A. 9:17-43(a)(1), against the intestacy laws, which declare – without limitation or qualification – that a child inherits to the exclusion of the decedent's siblings, N.J.S.A. 3B:5-4(a).[5]  To be sure, the parentage statute – born out of an unfortunate legal concept that viewed an illegitimate child as a nonperson, Trust Created Dec. 20, 1961, 166 N.J. at 352 – creates "one of the strongest rebuttable presumptions known to the law," ibid. (quoting 41 Am.Jur.2d Illegitimate Children § 10 at 213 (1995)).  More than a century ago, the Court of Errors and Appeals explained that to overcome this presumption the evidence had to provide "no possible escape from [that] conclusion." Wallace v. Wallace, 73 N.J. Eq. 403, 404 (E. & A. 1907); see also Trust Created Dec. 20, 1961, 166 N.J. at 352.

---

[5]  Our intestacy laws and the statutory presumption that a child born in wedlock is deemed the legitimate child of the wedded couple have ancient English roots, see In re Trust Created Dec. 20, 1961, 166 N.J. 340, 350-51 (2001); Sapery, 28 N.J. at 604.

As high as the hurdle might appear,[6] it was cleared because, as mentioned, a DNA test revealed Castellano fathered Gregory, Jr. See J.S. v. L.S., 389 N.J. Super. 200, 204-05 (App. Div. 2006); see also In re Estate of Thomas, 431 N.J. Super. 22, 36-39 (App. Div. 2013). Castellano's siblings recognize the conclusiveness of that evidence.

But decedent's siblings persist and contend their claim of an equitable adoption is supported by certain other circumstances: Gregory, Jr. was named after his mother's husband, his birth certificate memorialized what his mother and Gregory, Sr. then decided they would represent to the outside world about Gregory, Jr.'s parentage, their divorce judgment memorialized the existence of a father-child relationship, and an obituary referred to Gregory, Jr. as Gregory, Sr.'s son. We reject this argument primarily because the facts urged in support are the product of the conscious and deliberate steps taken by persons other than Gregory, Jr. He didn't choose his own name, he didn't participate in the birth certificate's creation, he wasn't a party to the divorce action, and he likely had

---

[6]    Examples of evidence found insufficient to overcome the statutory presumption can be found in In re Estate of Rogers, 30 N.J. Super. 479, 486 (App. Div. 1954), and In re Adoption by K., 92 N.J. Super. 204, 207, 222 (Cty. Ct. 1966).

A-0165-17T3

no input into a divorce judgment entered when he was six years old.[7] These facts do not support a contention that Gregory, Jr.'s fleeting relationship with Gregory, Sr. – who separated from his mother when Gregory, Jr. was less than three years old – somehow severed his natural link to Castellano.

The argument that an equitable adoption by Gregory, Sr. of Gregory, Jr. should be found here is without merit. Although long recognized in general as an available remedy, equitable adoptions have only been found in far more compelling circumstances. For example, in Burdick, 113 N.J. Eq. at 592, the court recognized an equitable adoption had occurred where the plaintiff's widowed mother was induced to marry in exchange for, among other things, her soon-to-be second husband's promise to adopt the plaintiff. When the second husband died many years later – having never formally consummated his promise to adopt – the plaintiff sought a decree of specific performance permitting him to inherit from the stepfather's estate. Ibid. In describing the scope of his authority, the vice-chancellor observed that it was "firmly established" that he was empowered to enforce "an oral agreement to adopt, where there has been a full and faithful performance on the part of the adoptive

---

[7] The record does not disclose whether Gregory, Jr. was in any way instrumental in the content of Gregory, Sr.'s obituary.

child[8] . . . and when equity and justice so requires." Id. at 595. Other courts later applying this principle similarly emphasized the critical need for an agreement to adopt. See In re Trust Under Agreement of Vander Poel, 396 N.J. Super. 218, 232-33 (App. Div. 2007). The concept has also been applied when an adoptive parent died two days before a final adoption hearing; in that circumstance the court recognized the decedent's agreement to adopt was beyond question. In re W.R. ex rel. S.W., 412 N.J. Super. 275, 277 (Law Div. 2009). And, in Ashman v. Madigan, 40 N.J. Super. 147, 149-50 (Ch. Div. 1956), a chancery judge applied these same principles in finding the existence of an agreement to adopt, even in the absence of "direct evidence of such an agreement," because of the "clear and satisfactory proof" of a fifty-year parent-child relationship as well as other circumstances that permitted an "inference" of "an agreement by the decedent to adopt the plaintiff."

The evidence in this case lacks the gravitas found in the earlier cases. There is no evidence that Gregory, Sr. ever agreed to adopt Gregory, Jr. To be sure, he was listed on the birth certificate as the child's father, but the evidence

---

8  The vice-chancellor found that the adoptive child kept his part of the bargain by leaving the home of his aunt, by residing with his mother and stepfather from the age of seven until he left home to marry many years later, and by treating his stepfather "with all the regard and affection" of a father.  Ibid.

reveals he was aware another man had fathered the child. And, although <u>Brill</u> requires that we assume Gregory, Sr. consented to his designation on the birth certificate as the child's father, the undisputed facts also reveal that his initial interest in acting as a parent to Gregory, Jr. did not persist for any lengthy period of time. Gregory, Sr. separated from Elisa before Gregory, Jr. reached the age of three, and there is evidence only of a fleeting relationship between Gregory, Sr. and Gregory, Jr. thereafter.[9] Even when viewing these circumstances in the

---

[9] Elisa testified at her deposition – and it has not been disputed – that the relationship between Gregory, Sr. and Gregory, Jr. barely continued after the divorce:

> Q. How often did Greg, Sr. see Greg, Jr. after you split up?
>
> A. Not very often.
>
> Q. Once a week? Once a month?
>
> A. Twice a year.
>
> Q. What would they do?
>
> A. He would pick him up and take him to his house, I guess, take him to the park and then bring him home.
>
> Q. How long did he stay with him?
>
> A. Sometimes four or five hours, on occasion maybe overnight. Not often and not a lot.

A-0165-17T3

light most favorable to decedent's siblings – as <u>Brill</u> requires – there is no evidence of the type recognized in our jurisprudence that could lead to a conclusion that Gregory, Sr. agreed to adopt Gregory, Jr. and, so, there would be no ground upon which to assume their relationship rose to a level that would, in conscience, sever Gregory, Jr.'s natural relationship with Castellano.

It is important to emphasize that we are not here attempting to determine whether, under these circumstances, Gregory, Jr. is entitled to inherit from Gregory, Sr. We are instead concerned with whether these circumstances – all beyond Gregory, Jr.'s control – require a judicial fiat that Gregory, Jr.'s legal relationship to Castellano ended. None of the authorities we have discussed – nor any others of which we are aware – support the use of "equitable adoption" to <u>destroy</u> a child's right to inherit. Instead, the theory was designed to <u>recognize and enforce</u> inheritance rights that, in the theory's absence, would be lost. Even the parentage statute on which decedent's siblings chiefly rely, was designed to "facilitate the flow of benefits from the father to the child," <u>Trust Created Dec. 20, 1961</u>, 166 N.J. at 352, not the opposite.

For the reasons expressed, we conclude that, even when giving decedent's siblings the benefits required by <u>Brill</u>, Gregory, Jr. was entitled to the judgment entered. As the vice-chancellor said in <u>Burdick</u>, 113 N.J. Eq. at 595, the doctrine

12

is evoked when "equity and justice" require.  Here, Chancery Judge Walter Koprowski, Jr. quite rightly rejected the siblings' arguments. Their arguments at best embody only the contention that because they had a fuller relationship with their brother than did Gregory, Jr., they and not Gregory, Jr. should inherit.[10] The Legislature thought otherwise, allowing for no exception to the priorities of inheritance that favor Gregory, Jr.  Had the decedent intended to provide for his siblings over Gregory, Jr., he could have executed a will that so provided.

     Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10]  We find the siblings' argument that the summary judgment motion was premature because they wished to pursue certain other discovery to be without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). We would add only that Gregory, Jr., timely responded to the interrogatories and document demands served by the siblings and that he and his mother also appeared and answered all questions at their depositions. The experienced chancery judge allowed for sufficient time for discovery in this matter, and the fact that new counsel appeared late in the game and suggested that Gregory, Jr. may have made representations as to his parentage on student loan applications or for benefits following Gregory, Sr.'s premature demise – which would have occurred, even if those things did occur, at a time when Gregory, Jr. was unaware of his true relationships with Gregory, Sr. and the decedent – is too inconsequential to stand in the way of summary judgment.

A-0165-17T3